[No. H032799. Sixth Dist. Jan. 11, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
LEOPOLDO ALEJANDRO CORTES, Defendant and Appellant.

**COUNSEL**

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and David M. Baskind, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McADAMS, J.**—A jury convicted defendant Leopoldo Alejandro Cortes of murder in the first degree and found true the allegation that he used a deadly and dangerous weapon, a knife, in the commission of the murder. (Pen. Code, §§ 187, 12022, subd. (b)(1).)[1] He was sentenced to prison for 25 years to life,

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

with a consecutive term of one year for the weapon enhancement. On appeal, he contends that the trial court erred prejudicially by unduly restricting the testimony of his psychiatric expert. We agree with this contention and will reverse the judgment on that basis.

Defendant also contends that the trial court erred by ordering him shackled during trial without a hearing, and without the requisite showing of manifest need. The People concede the court erred by failing to hold a hearing, and we accept that concession. Accordingly, we will direct the court to hold such a hearing, if the issue of shackling arises on retrial. Finally, defendant argues that the trial court erred by admitting evidence of his prior assaults, and that the prosecutor committed misconduct by injecting gang evidence into the trial despite an in limine ruling excluding such evidence. We reject those contentions.

## STATEMENT OF FACTS

*Introduction*

On January 27, 2006, Aptos High School student Justine French threw a party while her parents were out of town. News of the party spread by word of mouth. By the time the party was over, an estimated 150 people had attended. One person was dead.

Defendant stabbed Christopher (Chris) Carr 13 times during an altercation probably lasting less than two minutes. After the fight was over, defendant fled with his friends. The police found defendant at home and took him to the police station, where he was interrogated. During the interrogation, defendant lied about a number of things, but eventually admitted stabbing Carr. He said he did not know how many times he stabbed Carr.

*Events Leading Up to the Fight*

In addition to friends of Justine's, the party was attended by Justine's 21-year-old brothers, Tyler and Casey, and their friends and roommates: Cristin Murphy, Chris Carr, Forest Gleitsman, Tyler Scofield, Greg Gomez and Barry Baker. Casey had been drinking "pretty steadily" over the course of the night. Tyler brought a keg of beer and throughout the night, guests brought their own alcohol. Chris Carr was drunk.

By midnight, Justine realized that there were a lot of people in her house she did not know, and she decided it was time for "all the random people to get out of my house and just have a fun night . . . with my friends." Since her

brother Tyler was asleep, Justine and her friends, her brother Casey, and his friend Chris Carr, began telling people to leave.

Defendant and his friends Mike Hernandez, Taurean Jacobs, Dillon Ramey, and Eric Pridemore[2] had arrived at the party late, around 11:00 p.m. They socialized in the garage with a few people they knew. They went upstairs, and, according to Cristin Murphy, "clumped together next to the refrigerator." She found them intimidating.

Justine and Cristin asked them to leave. Cristin was polite about it. They ignored Cristin and refused to leave. Cristin left the kitchen to find Chris Carr. Greg Gomez[3] introduced himself to defendant and shook his hand, and then asked him to leave, but defendant reacted defensively, saying "I am Alex Cortes from the west side." Forest Gleitsman heard Gomez tell someone in defendant's group, "You need to get the fuck out of here." Casey stepped into the conversation and also introduced himself, asking defendant if he knew someone Casey knew from the west side. Gomez recalled that Cristin defused the situation by telling him that defendant was "so-and-so's boyfriend."[4] The group did not leave after Gomez spoke with them and Gomez left to smoke a cigarette in the backyard.

According to the witnesses, at some point, Chris Carr also joined the people telling defendant and his friends to leave. Most of the witnesses indicated that the fight in which Carr was stabbed occurred at that time.

However, Michael Gates testified that he saw defendant standing face-to-face with Chris Carr in the kitchen and "they were ready to get in a fight right there." He called to defendant, grabbed him by the hand and led him through the garage and into the backyard where he tried to get defendant to sit down. Defendant "was really worked up about Chris . . . upset." Defendant was saying that he would handle that guy. Gates said, "It's like not even worth it. . . . He's just drunk." Gates invited defendant to sit down and "[p]ack a chew." Defendant replied, "I'm already packing," and raised his shirt to show Gates the top of a knife handle. Gates repeated that it was not worth it, and that Carr was drunk. Ten or 15 seconds later, they "heard a fight break out inside." Defendant said, "I got to go," and ran through the garage and up the stairs to the kitchen. Gates also ran upstairs, taking a different route. Defendant confirmed much of Gates's testimony in his own.

---

[2] Eric Pridemore died in November 2006.

[3] Gomez testified for the defense.

[4] On rebuttal, Cristin denied telling Gomez it was all right for defendant to stay because she knew his girlfriend.

*The Fight*

None of the percipient witnesses actually saw the stabbing, though some saw the knife. And none of the prosecution witnesses saw a confrontation between Chris Carr and Mike Hernandez, though the defense witnesses testified that the confrontation between Carr and Hernandez precipitated the fight between Carr and defendant.

When Gates entered the kitchen, there was a big crowd pushing and shoving. He did not see defendant, but Carr was being forced backwards and ended up on the ground, near the kitchen island. Defendant was standing over Carr, with one foot on each side of him. Gates did not see defendant with the knife, and did not see stabbing motions, or any blood. Then everyone vanished, and Carr stood up covered in blood before falling to the floor.

According to Cristin, when defendant's group ignored her request to leave, she left to find Chris Carr and asked him to help her get the group to leave. He confronted defendant's group, arguing with someone who said he was from Watsonville,[5] and also with Taurean. He told the group "to get the fuck out." In the process, Carr accidentally sprayed spittle in defendant's face. Defendant charged Carr immediately. They broke a potted plant and went into the wall. The last thing she saw was defendant pushing Carr's back into the wall. She immediately ran out of the kitchen and into the master bedroom to wake Tyler. When she got back to the kitchen with Tyler, Carr was lying facedown next to the refrigerator.

James Brownfield, who described himself as "moderately drunk," first became aware of a commotion before he saw defendant and Carr standing and facing each other. He did not see what started the fight, but initially there were other people in it, as well as defendant and Carr. Brownfield saw defendant come towards Carr, and as he reached around, Brownfield could see a knife somewhere on defendant's waist, for a 10th of a second. Then he saw defendant and Carr with their arms wrapped around each other. He saw defendant reach up with both hands, and saw Carr do the same thing. That was the last part he really remembered, because after that defendant was not there anymore and Carr was on the ground. The whole encounter was "real quick"—"seconds." However, he admitted he told the police he saw defendant pull the knife and stab Carr.

Brianna Brownfield "didn't really see how the fight started." She heard a crash, saw people running over to stop a fight and then saw Carr "fall to the floor." She estimated that 10 to 15 seconds had elapsed from the crash to Carr

---

[5] Mike Hernandez lived in Watsonville.

falling. The last thing she saw before people blocked her view was Carr telling defendant and a Hispanic friend that they needed to leave.

Casey French also testified that when Carr yelled at defendant and his group of friends to leave, spit came out, and defendant "made the official physical attack." He punched or shoved Carr in the upper chest. They "kind of fell" into the corner and wrestled, but Casey "couldn't really see what was going on" because of the crowd of people around them. The next thing he knew, Carr "popped up," stumbled into the kitchen and fell down. His friend Forest, an EMT (emergency medical technician), grabbed Carr and said, "Oh my God, he's been stabbed." Casey did not see Carr threaten, push or strike anybody before defendant attacked.

Erin Cabral was the designated driver for his friends that night and drank no more than one beer. He knew defendant from playing Pop Warner football when he was 13. When defendant arrived, Erin greeted him. He saw Carr "arguing with somebody"; then defendant came "out of the side," possibly from the garage, and he and Carr started fighting. He thought defendant hit Carr, and they "went down" but he "couldn't see anything else from there" because his "visibility was blocked by everybody." He did not see who Carr was arguing with before defendant hit Carr. He did not see what happened before Carr started arguing with someone. He did not see Carr punch or push anybody. He did not see defendant use a knife. The next thing he saw was that both men stood up, Carr was "woozy" and then he went down. Erin saw blood on Carr's shirt and yelled for someone to call 911 because Carr had been stabbed.

Taylor Florence did not drink anything that night. She knew defendant from Aptos High School. She saw him when he arrived with his friends and greeted him with a hug. She saw an argument between Carr's friends and defendant's friends. She stopped paying attention for a time, and the next thing she saw was defendant hitting Carr in the hallway. She did not see Carr do anything to provoke getting hit. After defendant hit Carr, "a whole bunch of people" jumped in and she could not see defendant and Carr fighting anymore. She left the party.

Forest Gleitsman was drinking at the party. When he noticed a group of six to eight male teenagers he did not recognize huddled together, he became a little upset. When defendant's group entered the kitchen, he, Carr, Ryan and Greg (Gomez) confronted them and told them to leave, not very nicely. Defendant's group "didn't budge." Carr said: "I'm not asking you to leave now. I'm telling you to leave." Defendant stepped up to the front of the pack and said something like "Fuck you. West Side Santa Cruz, fool." When Carr responded that he did not care about the west side, spit flew out of his mouth

and landed on defendant. Forest "saw a punch fly." He did not see exactly who threw the punch. Before the punch flew, Carr was standing. He did not punch anybody. Then people were in front of Forest and he got pushed back. A pot broke, and the two men fell into the hallway together. They were wrestling towards the end of the hallway, on the ground, and it "[k]ind of looked like hugging." Their bodies were moving.

Then the crowd watching the fight was pushing him around, and Forest left to get help. He was gone about a minute. When he came back, Carr was looking pale and walking towards the refrigerator. Then he collapsed, and Forest went to help him. When he saw the spots of blood on Carr's shirt, he realized Carr had been stabbed.

According to Ricardo Robledo, the chaperones of the party were "tough-guy" talking to some people who had shown up late and were uninvited, when a fight broke out. He did not know who started it. Initially, "a lot of people started throwing punches and [there was] a lot of pushing." Within 20 or 30 seconds, when defendant and Carr moved into the hallway, he saw the knife in defendant's hand. He could see Carr "trying to take down Cortes, or wrestle him." They were both holding on to each other. He did not see the knife while defendant and Carr were wrestling. Defendant got pushed against the wall and held the knife "head height," with his elbow at 90 degrees from his body and his fist near his shoulder. After that, he saw Carr with stab wounds, but he did not see defendant stab him.

Justine saw Carr talking to defendant and his friends. She did not know who threw the first punch, or exactly what happened, but a mirror on the wall was shaking and a pot fell and broke. She tried to stop the fight. She did not really know what happened, and then she "just saw Chris on the floor, and there was blood everywhere."

Brandon Vega went to the party with Aaron Michael Gates. He did not have anything to drink that night because he was driving. He was in the kitchen, near a doorway, when he heard yelling and then saw pushing on the other side of the kitchen. Lots of people started throwing punches and pushing, and someone got punched in the head. Then the crowd started to thin out and, for a "split second," he saw defendant standing in the kitchen, at the doorway of the stairs leading down to the garage, holding a knife in his hand down at waist level. Perhaps 30 seconds had elapsed since the fighting started. He testified he did not see anything after that because his view was blocked. However, that night he told a sheriff's deputy that he saw defendant on the ground with the knife in his hand.

Leslie Leyton was cleaning up the kitchen, and telling people she did not know to go home, when a fight broke out. People were pushing and gathered

around the fight in a big circle. She heard Casey French say "let them fight, a good old fist fight." She heard a pot break and then everybody ran. The only face she remembered seeing was Mike Hernandez's: he was on the outside of the circle trying to shove his way in. When the crowd scattered, she saw Carr on the ground and called 911.

Mike Hernandez[6] noticed defendant was arguing with a person who was "cliqued up" with a group that included Greg Gomez and Forest, whom he knew. He stepped between them to defuse the situation. He returned to another conversation, but then noticed that the person who had been arguing with defendant was now arguing with Taurean, so he intervened between them. He again returned to his conversation, but then after a minute or two, he saw that defendant and the same guy were arguing again. Hernandez pulled defendant back and told Carr that they were just there to have a good time: "Why do you have to be a tough guy?" Carr replied, with such force that spit hit Hernandez's face, "Because I am a fucking tough guy."

When Hernandez turned to wipe the spit away, Carr grabbed Hernandez by the collar with both hands and tried to choke him. People rushed in and packed around them as Carr came closer and closer to Hernandez, while Hernandez grabbed Carr's arm and tried to push him off; then defendant came from the side and pushed Carr, forcing him away from Hernandez. Defendant and Carr fell to the ground.

Hernandez testified that Carr was on top of defendant and "had him pinned down" in a hold and that defendant could not get out if it. At first, Hernandez tried to keep Carr's friends from joining in the fight against defendant. While the fight on the ground was still ongoing, Hernandez and Taurean left through the garage, meeting Pridemore outside. Hernandez never saw a knife, but while he was standing outside he heard one of the French brothers yell "He stabbed him." When Hernandez and the others heard him say he was going to get his gun, they ran to the car, afraid of getting shot. Defendant was already waiting beside the car.

Taurean confirmed much, but not all, of Hernandez's account of the events before the fight erupted. He testified that defendant and Carr were arguing and yelling at each other, when Hernandez "came up and separated them and asked them what's the problem." Hernandez walked away and defendant and Carr kept arguing. He did not see Gates grab defendant and take him outside. Twenty seconds later, Hernandez returned and asked Carr "why is he trying to be such a tough guy?" Carr responded "because he is hard" and grabbed Hernandez by the collar. He did not choke Hernandez. Taurean testified that

---

[6] Hernandez testified for the defense.

Hernandez pushed him off, and then defendant pushed Carr in the middle of the chest. They wrestled. Then Carr took defendant down, still wrestling. They stood up and Carr pushed defendant against the wall and turned off the lights. When the lights came back on, they were wrestling on the ground for another five seconds, and then defendant stood up and walked out. Taurean claimed to have a clear view of the fight. He did not see the knife. He saw Carr start to get up, and then he left with Hernandez. He had no idea Carr had been stabbed. Outside the house, he heard people yelling, "He killed him. He killed him."

On cross-examination, Taurean admitted that he told a district attorney's inspector that defendant "socked [Carr] on the face on the side. And then they started fighting right there." He did not think defendant was being killed by Carr while he was lying on the ground. He admitted he had previously testified that in the car, he asked defendant "Dude, did you fucking stab him?" and defendant answered, "Like, dude, I already had a knife in my hand, and I didn't know. I didn't know it was going to happen." Taurean agreed with the district attorney that he responded, "[F]uck. You are screwed," because he thought defendant did something wrong.

*After the Fight*

Defendant dropped the knife sheath and threw the knife into an open area.[7] He waited behind Pridemore's car until the rest of the group arrived. They all left in the car together. Inside the car, they asked defendant "why he did it." He said he was surrounded. At that point, they were talking about the fight, not about using a knife. Pridemore dropped Taurean and Hernandez off at Hernandez's house. Somebody told defendant to call his girlfriend to come get him. She picked him up from Hernandez's apartment complex and drove him home.

Chris Carr was pronounced dead at the scene. Sheriff's deputies interviewed numerous party guests at the house. Defendant was arrested the next day. His clothes were taken as evidence and he was photographed. He did not have any injuries on his body. During a search of defendant's home, sheriff's deputies discovered defendant's wet clothes and shoelaces in the washing machine, and his shoes in a locked storage room.

*Defendant's Statement*

Defendant gave police several different versions of what he had done the previous night. First, he said he had been home all night. Then he admitted he

---

[7] The parties stipulated that the knife, with Chris Carr's DNA on it, was recovered from a pond on the French property.

went to the party, but denied any involvement in a fight. Then he said Hernandez was in a fight with Carr. Then he admitted he was in a fight with Carr, but said Carr got pushed into him while his knife was out and "fell into it." Then Carr got turned around and "put his stomach in it." Finally, defendant said three people rushed him and he swung his knife "[q]uite a few times."

*Evidence of Prior Fights*

Santa Cruz County Sheriff's Office (Sheriff's) Deputy Mark Pool investigated a battery involving defendant that occurred at Aptos High School on August 30, 2004. Defendant told him that he heard one of two students say something, but he was not sure what was said, and so he approached them. One of the students stood in front of him. Anticipating that he was going to get jumped, he punched that student and pushed him to the ground. The other student came up from behind and defendant started to fight with that student. He hit that student and they both fell down the stairs. Pool determined that defendant was the primary aggressor and cited him for battery and fighting on school grounds.

Pool investigated another fight involving defendant that occurred at Aptos High School on September 28, 2004. Cortes told Pool that two students passed him on the way to class and one of them stared at him. He asked that student, "What are you looking at?" A few minutes later, defendant walked out of the classroom and up to the students. One of them said, "Let's go to the bathroom." Defendant dropped his backpack and hit the student in the face and head. The student fell backwards onto a railing, 10 feet above the floor below. Defendant tried to throw him over the railing, while punching him in the face and head. A teacher yelled at him to stop, and he commenced hitting the other student until another teacher stepped between them. Defendant said he did not stop hitting the student when the teacher told him to stop because when he is hitting someone and somebody tells him to stop, it makes him so angry he keeps hitting him. He said he would jump that student again if he had the chance. Pool arrested defendant for battery.

On October 21, 2004, Sheriff's Deputy Peter Hansen investigated a reported battery at the intersection of Lucerne Avenue and Manfre Road in Watsonville. As he was interviewing the victim and a witness, the four suspects, including defendant, walked by and the witness and victim identified them. Believing defendant was the aggressor who initiated the fight, Hansen arrested defendant for battery.

On November 25, 2005, Mervyn's loss prevention officer Patrick Gibney suspected defendant of shoplifting packages of underwear. Gibney and his

partner approached defendant after he had already left Mervyn's and told him that he had to return to the store with them. Defendant assumed an aggressive stance and refused to go back with them. When Gibney and his partner attempted to arrest and handcuff defendant, he actively resisted, requiring them to take him to the ground to handcuff him.

*Autopsy Findings*

Dr. Richard Mason, forensic pathologist for the Santa Cruz County Sheriff-Coroner, testified as an expert in pathology and knife wounds. He concluded that Carr bled to death as a result of a stab wound to the heart. Carr had been stabbed six times in the chest, six times in the back, and once on the elbow with a narrow-bladed knife. All of the wounds were about one-half inch in length and ranged in depth from 1.5 to 2.0 inches to 3.5 to 4.0 inches. Since the point of the knife was not as sharp as it could be, a person would "have to punch with it, to get it to penetrate." The wounds could have been caused with the four-and-one-eighth-inch-long knife recovered from the scene and shown to him at the time of the autopsy. The elbow wound could have been a defensive wound.

Most of the wounds appeared to go straight in, "something approximating 90 degrees to the front surfaces and the back surface of the body." In Dr. Mason's opinion, this implied "a lack of much in the way of defensive motion on the part of the victim." Further, "you're going to need some distance, some room, [to] get some speed to use this thing." The wounds could have been inflicted in "a minute or a little bit more." He thought it would be "unlikely" that the wound to the heart, or two of the other wounds to the chest, could be inflicted while the two bodies were next to each other in a bear hug. However, from his examination of the body, there was no way he could tell what the relative positions were of the two people involved when these wounds were inflicted. Nor could he tell whether any or all of the wounds were inflicted when somebody was standing up or on the floor. It was his "impression" from the totality of the wounds that the initial encounter was face-to-face and the wounds on the chest occurred before the wounds on the back. None of the wounds, however, even the heart wound, would have "stop[ped] someone in their tracks" because "you're going to have some period of time where the bleeding occurs." Asked if he had an opinion as to whether or not these wounds seemed to be random wounds or something with more purpose, Dr. Mason was allowed to opine that "it looked like somebody was using the weapon to attack Mr. Carr, and they wanted to finish the job."

Aside from the stab wounds, Carr also had an abrasion or contusion right at the lateral margin of the right eye, over the cheekbone, a small abrasion to the lips, small abrasions or scraping wounds to the right knee and the feet,

and small abrasions to the top of the right thumb, the right fourth finger and the knuckle of the right fifth finger. The shirt Carr was wearing had holes in the cloth that were consistent with the wounds. The parties stipulated that at the time of his death, "the amount of alcohol in [Chris Carr's] system was at least twice the legal limit permitted by law to drive a motor vehicle in the state of California."

*Defendant's Testimony*

At the time of trial, in February 2008, defendant was 19 years old. From middle school through high school, he bounced back and forth between Watsonville and Santa Cruz, his mother and his sister, because of the problems in his mother's home.

When he was 12 or 13 and living with his mother in Watsonville, his mother had a boyfriend named Charley. At the time, defendant "was being a little butt head to my mom," and did not want to go to school. She was pretty lenient and did not care. One day, his mom was yelling at him as they came into the house from the store. Charley was sitting on the couch, and as defendant was going to his room, Charley said something like "What the fuck's your problem?" and flipped the coffee table onto the couch. Then he grabbed defendant by the shirt and threw him against the couch over the armrest. Charley was big compared to defendant, and defendant ended up with his back bent over the armrest and Charley on top of him, yelling at him. Defendant was kicking to get free, and Charley picked defendant up, dragged him into the kitchen and "slammed" him into the kitchen counter. Defendant lost his breath. Charley let him go. Then he picked defendant up off of the ground, grabbed him by his shirt, and said he was going to throw him downstairs. Defendant "peed in [his] pants." Charley did not throw him down the stairs. Defendant held on to the doorway to the stairs and Charley went to defendant's mother's bedroom and "put his head through the wall and cussed my mom out." His mother was crying, defendant was crying and all wet, and Charley walked out. Afterwards, he would think about this incident. He does not remember thinking about it the night at the French house. But he remembered "the trapped feeling that I had. I wasn't thinking about the incident [with Charley] but just the same feeling I had. It was the same feeling I had that night."

In August of 2005, he moved in with his sister, her husband, her four children and her in-laws in West Santa Cruz. He told his probation officer and counselor that his mother used and trafficked in drugs in and out of her house. The courts gave him the choice of going to live with his father or his sister, and he chose his sister because his father was kind of strict. His sister became his legal guardian.

When defendant was 16, and attending Aptos High School, he got into several fights. His friend Jared, with whom he was living in a garage, exchanged fighting words with someone on the bus to school. Jared told defendant that he was going to fight this individual. When three people later approached defendant, he swung and hit one of them in the face. That person hit him back, a fight ensued, and campus security broke it up. He did not know why he got into this fight. "It was just stupid."

About two weeks later, he was walking to class when one of this same group of individuals walked past him and challenged him to a fight in the bathroom several times. Defendant was with his own group of friends. As defendant pulled off his jacket and backpack, the other boy hit him in the face and pushed him into a railing. Someone in defendant's group then hit his assailant in the side of the head. Defendant regained his balance and rushed back into the fight. Stupidity was the reason for this fight as well.

A third fight occurred when he was walking down the street with Jared and saw another fellow "trying to be hard in front of his girlfriend." The fellow was parked off Manfre Road. A friend of defendant's called out to the fellow, who picked up a stick. When the friend moved "out to the side," the fellow went after defendant, kicked him, and hit him on the arm with a stick. They "locked up" and fell into a bush. The fellow "had [defendant] choked." Defendant got up and started to walk down the hill, where he met up with his friends, who were going the other way. When they turned to go back up the hill, they were met by the police.

In January 2006 he was living with his sister and attending VISTA Community School in downtown Santa Cruz. On January 27, 2006, he had an argument with his girlfriend, Julia Mark, bought a small bottle of tequila, took "a pretty big sip" to annoy Julia, and went to his friend Dillon's house about 9:00 p.m. His friends Dillon Ramey, Taurean Jacobs, Eric Pridemore, and Mike Hernandez were there. Hernandez was invited to "a pretty big party" in La Selva Beach and they went there. Defendant did not know the hosts.

Defendant had a knife, in a knife holder, on his belt. He had recently bought it at a flea market for $5 or $6 from an antique seller because he had liked the way it looked. He had owned lots of knives before this one; his father had given him his first pocket knife when he was eight years old. He usually carried a knife for "either protection or . . . [k]ind of, just the way I was brought up." On this night, he was wearing the knife because it was already on his belt when he had pulled on his pants.

Defendant and his friends parked the car in an area where many other cars were parked and walked to the house. He quickly socialized with a couple of

people he knew from school and made his way through the garage and up the stairs to the kitchen area. He had not gotten very far when he was asked by a couple of males "who the fuck do I know here." One of the men, he later learned, was Christopher Carr. Defendant did not know him, or any of the other men. Defendant said he had heard about this house having parties before, and knew about the brothers at this house. He also mentioned the people he had met before entering the house. Chris Carr "was being pretty aggressive to" defendant, and defendant was kind of aggressive back, "letting him know that I wasn't here to start a problem or anything like that." People started to form a circle around them, and then an acquaintance, Aaron Michael Gates, tugged defendant on the shoulder and led him out towards the garage. They both walked down the stairs, and they sat down and talked. Defendant did not remember "what was said or what happened," except that he lifted up his sweater so Gates could see the knife on his waistband. He did not pull out his knife. But the next thing he remembered is that he ran back inside because he "heard a commotion." He thought there was a fight. As he turned the corner to look into the hallway, he saw Hernandez "being up against the wall by somebody with his hands around his collar area." He did not know who it was at the time. Defendant "didn't even stop or think. I just—I went and pushed him." He pushed Mike Hernandez's assailant in his shoulder with an open hand. After pushing him, defendant stopped. He did not have his knife out at this point, nor was he thinking about his knife. He was thinking, "I'd seen my friend—looked like, to me, he was getting choked. So I just pushed him. And I thought that I was just pretty much helping out my friend. I don't remember what was going on in my head at the time."

Everything happened very fast. Carr stepped sideways, looked defendant in the eye and ran towards him. His body connected with defendant's arm, and they went backwards into the hallway. Carr pulled defendant to the wall. At the same time, defendant pulled out his knife. Carr "had control" of defendant because he had defendant "wrapped," except for defendant's right arm which was free. Defendant "started stabbing him upward into his chest area."

Asked if he remembered doing that, defendant replied, "No." He did not know if he remembered pulling his knife out or reaching for it, or just having it out. "It happened quick." "I don't remember seeing anything. I was looking at his head." Defendant pulled out the knife because "I felt overpowered by someone who is pretty big and I had no control over my feet. And, when he knocked me against this wall, I lost my breath and I panicked." What was going through his head was "[t]hat I need to get out of this hold or just get away from him."

Defendant did not remember stabbing Carr at all in the chest area. He remembered falling backwards, sliding off the wall, and at the same time

Carr's body came closer to defendant's. Defendant twice said he remembered "watching" or "seeing" his arm stab Carr in the back; that he did not remember how many times; that it seemed like one time. He remembered falling to the floor. "And it happened so quick. I don't remember when he got off me or what happened. But I was on the ground, and I got up real quick and ran out of the house."

Defendant did not remember hearing anything during the altercation. "It just seemed really still. I remember, when I pushed him, I see people in the back towards in the kitchen. But I don't remember any sound or anything that the people were doing."

Defendant walked fast to Pridemore's car, breathing heavily. He was scared. When he got to the car, he started dry heaving. He looked down and saw that he still had the knife in his hand. He threw the knife into an open area. He thought he unbuckled the sheath and let it drop. His friends returned to the car and they drove away. Pridemore was yelling hysterically and defendant was in shock. He thought Pridemore asked him, "What did you do?" and that he answered, "I think I stabbed him," but defendant did not remember. They drove to Mike Hernandez's apartment complex in Watsonville. His called his girlfriend and she picked him up from there and drove him home to his sister's place.

Defendant told his brother-in-law, Tony, "I think I stabbed somebody." Tony told him to take his clothes off and get into the shower. He did that. He put on a pair of shorts and went to lie down in the living room with his girlfriend, but he did not sleep. He stayed up trying to figure out what happened; he was in shock.

Tony also advised defendant that the cops were going to arrest him and he should lie. He suggested defendant say that he was home watching a movie and did not go out. His sister was there during this conversation.

The police arrested him the next morning. Later that day, he spoke with the police. He admitted that at first, he did not tell them the truth. First, he told them a made-up story. He told them he was not at the party, even though there were three or four people at the party, besides his friends, who knew him. Next, he told the police he was there, and that there was a fight, but he was not involved. He lied because he was scared, and he "just wanted to actually feel that [he] was no part of anything." At that time, he "really felt that [he] didn't do anything wrong. . . . It was weird" and did not "seem real . . . at all."

Defendant never told them the whole truth. He said that he was involved and the victim had "backed up into my knife." He acknowledged "that was

the most stupid point I could have come up with." He admitted that he purposely pulled out his knife.

When he first found out that Chris Carr was dead, he could not believe it, because he "didn't know it was that serious. I only stabbed him once or twice."

On cross-examination, defendant testified that he did not know he was going to attack Carr when he went back upstairs, and did not remember telling Gates, "I'll handle him." He did not remember Gates saying, "Let's pack a chew," or his responding, "I am already packed." He did remember showing Gates the knife. He denied that he was mad at Carr for the way Carr talked to him. He maintained that he pushed Carr on the shoulder, although it may have looked to some of the witnesses that he hit Carr in the face. He pushed Carr because Carr "was checking [*sic*] my friend. I wanted to help my friend." He agreed he had blindsided Carr; he did not recall telling his sister that someone had blindsided him. Defendant testified that he had his breath knocked out of him when he was backed into a corner by Carr. He said Carr was "a big guy" and more muscular than he was. After being pushed against the wall by Carr, he pulled out his knife. He agreed that when he pulled it out, he was going to use it. He denied thinking about the knife when he walked out of the kitchen with Gates. He did not recall being approached by girls who told him it was time for his group to leave the party.

Defendant agreed with the prosecutor's statement that he had heard witnesses testify at trial that "it looked like just a regular fight at a party." However, he believed he needed to stab Carr. Asked if his life was threatened, defendant replied: "I panicked. The wind got knocked out of me, and I felt just the same way I felt before previously throughout my life, and I felt that I needed to pull that knife, so I did." Under continued questioning about whether he thought he would die if he did not pull the knife, defendant reiterated that he "panicked more or less," but he did not think he overreacted. "The wind was knocked out of me. I didn't have any control over me. I pulled out the knife." He wanted to get Carr off of him. He used the knife because that was all he had. He could not have pushed back or wrestled. Asked if all the witnesses were wrong who said they saw defendant and Carr wrestle, defendant responded. "[P]eople observe different things. I am in my shoes. I feel I did what I had to do." At the time, he did not think he had done anything wrong; in hindsight, he did not know if he would have done anything differently. He had been in fights before, but he had "never been in a situation like that."

Defendant admitted that "[p]retty damn close to" everything he said in his statement to the police was a lie. He acknowledged that in response to police

questioning about how many times he swung the knife, defendant said "[Q]uite a few times." However, he did not remember actually swinging the knife quite a few times; he only saw his hand one time. At that point in the interrogation, he was "still telling part of the truth but lying throughout the whole time I spoke to anybody."

Defendant testified that he called home from the interrogation room and spoke to family members. He did not know the conversation was recorded. He did not remember all the details of the conversation, although he knew it had taken place. When the police "talked to [him] about how Chris Carr had been stabbed and they suspected [he] did it and gave [him] all this information," he knew he was in trouble, and that is why he told his family he was "going to be away for a long time." He recalled that when the voice said "Oh, Alex did you tell them anything," defendant said, "No. I told them what happened. He has—he has—he has eight stab wounds, and he's dead." Then the voice said, "Oh. God. But you were defending yourself," and defendant answered "Yeah. It was. But it doesn't matter. I am gone for a while." When, later in the conversation, he said "Either that—it's that—it's fucking murder . . . I killed him," he was referring to "what the cops told me." He acknowledged that the voice replied, "Stop saying that, Alex. It was self-defense," but he did not remember it. He recalled going somewhere the next day with Detective Dimick and asking him how long he could get for murder charges, and what the bail would be, but he did not recall telling Dimick, "I am just going to go with the self-defense thing."

## DISCUSSION

*Undue Restriction of Psychiatric Evidence*

### *Contentions*

Dr. Harvey Dondershine was retained by the defense to examine defendant and render an opinion about defendant's likely mental state at the time of the offense. Dr. Dondershine memorialized his findings in a letter to defense counsel. On October 12, 2007, the court held a hearing to determine the admissibility of Dr. Dondershine's proposed testimony. (Evid. Code, § 402.) Following the hearing, the parties submitted memoranda of points and authorities.[8] The court subsequently ruled that Dr. Dondershine could testify about dissociation and posttraumatic stress disorder in general, but could not testify about defendant's mental condition at all.

---

[8] Dr. Dondershine's letter to defendant's attorney was attached as an exhibit to the prosecutor's "Motion In Limine #15" to exclude outright or substantially limit Dr. Dondershine's testimony at trial, which was filed after Dr. Dondershine testified at an Evidence Code section 402 hearing.

Defendant contends that the trial court erred by "precluding [Dr.] Dondershine from opining about whether Cortes was in a dissociative state while stabbing Carr multiple times and from pointing out aspects of Cortes' history or behavior which would have supported his opinion." Defendant argues that by excluding such testimony, the trial court's ruling deprived Cortes "of his constitutional due process right to present a complete defense." For his part, the Attorney General concedes that "[i]f appellant had sought only to introduce expert testimony that he was in a dissociative state, then it may have been error to exclude such testimony" inasmuch as "[a]ppellant is correct that he had the right to have an expert testify that appellant was in a dissociative state when he stabbed Chris." However, defendant also "sought to have Dondershine testify . . . that appellant acted in self-defense[;] that appellant entered a dissociative state which was characterized by lack of volition[; and] that it was a normal response for appellant to stab Chris so many times. But all of those would have usurped the jury's role."

As we shall explain, we are persuaded that the trial court's ruling was unduly restrictive of the type of psychiatric evidence defendant should have been able to present at trial, a proposition which the Attorney General essentially concedes. We also conclude that on the facts of this case, defendant was prejudiced in his ability to mount a defense to premeditated and deliberated murder.

*Factual Background*

*Dr. Dondershine's Report*

According to Dr. Dondershine's report, his opinions expressed therein were based upon the doctor's two-hour clinical interview with defendant and review of the transcript of the police interrogation of defendant. Dr. Dondershine's report consisted of a summary of the offense, from defendant's point of view, and his responses to three questions posed by defense counsel: (1) "[i]s it psychiatrically likely that Alex acted out of fear and not anger"; (2) "is it psychiatrically likely that Alex did not anticipate he would become the target of the attack"; and (3) "is it likely that Alex's mental functioning was overwhelmed and therefore impaired during and as a result of the fight with Mr. Carr as one would expect if he was truly subject to the extreme stress of a perceived life-threatening danger?"

According to the report, defendant went to a party in La Selva Beach intending to "have a good time," but he was immediately confronted by "a very big, very drunk, very hostile man," Chris Carr. He tried to defuse the situation by shaking the man's hand before a friend "whisked" defendant away and explained that Carr had been confronting people all night. A few

minutes later, defendant heard screaming and thumping upstairs. "Believing a friend was in danger, Alex ran towards the sound." Seconds later, he saw that Carr had his hands on a friend's neck. He charged Carr and knocked him away from the friend. Then Carr ran at defendant, "pinning him in a bear hug and violently throwing him against a wall. Alex could not breathe. He says he knew 'the feeling.' He felt he would die if he didn't get away. The noise around him disappeared." At this point, defendant pulled his knife from its sheath and stabbed Carr, but Carr did not stop. "Alex then 'saw my hand stabbing down' through silence a second time. Alex does not have any memory of the next several seconds during which he continued stabbing Mr. Carr. Moments later, Carr released his grip. Alex heard sound again, people calling his name" and ran away. "The 'feeling' of impending death Alex was recalling when attacked by Carr was the same feeling of impending death he experienced at age fourteen when a cruel and dangerous friend of his mother had similarly attacked him. On that occasion, his mother intervened and rescued Alex. The still enraged man, however, then smashed his own head through the wall near the spot where he had Alex pinned in submission."

In Dr. Dondershine's opinion, defendant was "clearly . . . more teen than adult, more empathetic than cold, and more follower than leader." He was also chronically anxious but not particularly angry. Dr. Dondershine also expressed a number of opinions about how teenagers act.[9] But the core of his report was his finding that in all likelihood, defendant entered a dissociated state in response to the "extreme stress of a perceived life-threatening danger." In his view, "Alex 'stabbed' once. The second time, he says he watched his hand move in silent space. This odd description suggests Alex was experiencing the sense of unreality that occurs during a dissociated mental state evoked by traumatic stress. From this point to the moment of his disengagement, Alex remembers neither hearing sound nor repeatedly stabbing. Presuming there was sound and stabbing, Alex's mental functions were impaired and he was acting more instinctually than with reason, judgment, premeditation or contemplation. A narrowed focus of awareness (absence of sound) and impaired encoding of memory (amnesia for stabbings) would be expected. There are two types of memory: narrative and emotional. Narrative (story) memory is laid down in the hippocampus (cortex). Emotional (somatosensory) memory is laid down in the amygdala (limbic system). Under

---

[9] For example, in his view, teens would likely come to the aid of a friend in danger out of teen loyalty and the conflicting needs for independence and emotional attachment. He found this "especially true for Alex." He also found it "psychiatrically likely" that defendant did not anticipate becoming the target of an attack because when faced with situations that demand immediate action, "[t]eens, as well as many non-teens . . . do not have the brain-based wherewithal with which to summon up and integrate memory, judgment, planning and anticipation. . . . Teens tend to be impulsive, trial-and-error actors rather than contemplators and planners."

traumatic stress, narrative memory fails to encode (amnesia) while the 'speechless terror' of emotional memory is still able to imprint traces in the amygdala. These imprints can emerge in post traumatic emotions but are not readily retrievable in semantic (narrative form)." He concluded that "Alex's behavior is consistent with an act of self-defense and the mental state described above."

*Dr. Dondershine's Testimony at the Evidence Code Section 402 Hearing*

At the hearing on the admissibility of Dr. Dondershine's proposed testimony, Dr. Dondershine testified that he is a board-certified psychiatrist and a Distinguished Life Fellow of the American Psychiatric Association. His medical training included a one-year fellowship in child and adolescent psychiatry. He is also a lawyer, and has taught psychiatry and mental health law for psychiatrists at Stanford University for 30 years. He has testified in state, federal and military courts. He has published articles on posttraumatic stress disorder (PTSD).

He has practiced psychiatry since 1970. One of the areas on which his clinical practice has focused is PTSD. In fact, he was the psychiatric director of the National Center for PTSD from 1979 to 1999.

In this case, Dr. Dondershine reviewed a two-page summary of the case that was provided by the lawyer, an audiotape of part of the police interrogation, the transcript of that tape, and about 200 pages of police reports related to the investigation of the offense, and probation reports relating to juvenile court proceedings involving defendant dating back to 2004 (when defendant was 15). Dr. Dondershine believed this was sufficient to render opinions on the specific questions propounded to him by defense counsel.

Dr. Dondershine was questioned about his report by defense counsel. Asked if defendant "was acting out of fear and not anger at the time of the confrontation with Mr. Carr," the doctor answered that yes, in his opinion, it was likely. His opinion was based on his understanding of the facts, namely, that "Alex had rushed to the scene of where he thought a friend was in danger, and that he was acting to help out someone." Then, he became "the subject of attack." From that point on, defendant "was acting basically out of fear rather than anger" and as soon as "the focus of his fear subsided, the attack, then he left the scene."

Asked if "it is likely that Alex's mental function was overwhelmed and therefore impaired during the fight," Dr. Dondershine testified that it was. His opinion was informed, first, by defendant's recounting that he was "terrified,

overwhelmed physically, emotionally" by a person who was bigger than he was. It was also informed by defendant's description of the event. Defendant reported that he took the knife out of his waistband in professed fear for his life and then, he said, "I stabbed. . . . I saw my hand coming down." From that point on, defendant said, he was unaware of what happened, of his actions, or the continued stabbing. There was no sound until the end of the period of intense threat. Of interest to Dr. Dondershine was that "The first was first person, 'I stabbed.' The second is, 'I saw my hand coming down.' [¶] And then from that point on, not only was he . . . unaware of what happened, actions, continued stabbing, or even sound . . . until the end of the period of intense threat."[10] Dr. Dondershine explained that "the notion of moving out of himself to see his hand" and the disappearance and subsequent reappearance of sound, with no recallable memory in between, was typical of how people react in such situations and is recognized as the psychiatric condition of dissociation.

The behaviors described by defendant were consistent with the phenomenon of dissociation, which "usually [is] coming out of centers in the brain a little bit lower than normal reasoning, . . . more from . . . the amygdala less than the cortex or hippocampus." "[M]ental functions are impaired during" the time that the behaviors are manifest. Dr. Dondershine would expect there to be residual memory impairment, "[b]ecause recallable narrative memories, story memory, typically fails under high stress. As the heat of stress increases, narrative memory for the event and the emotional traces [of] memory of the event diverge. As stress increases, narrative memory, which is recallable at will, can become very strong. But then the circuits are damaged. Narrative memory disappears. It's not formed. [¶] Emotional memory can be laid down, but it's not voluntarily recallable. It may not be there, or it may be only an emotional trace. [¶] So if the stress was enough to produce the change in sound and sight, I would expect that it would be enough to impair memories being laid down in a recallable fashion during the same period of time." The psychiatric part of this event ends the moment defendant hears sounds and becomes aware of his surroundings again.

The phenomenon of dissociation is a well-recognized psychiatric condition that is found in ordinary forms in everyday life, and also as a reaction to stress. "It's increased in people with a history of victimization, and it also can be brought out in dramatic forms in times of extreme traumatic stress."

Asked if there is "anything about your interviews or gathering information regarding Mr. Cortes that makes you think he falls into that category," Dr. Dondershine replied that there was. Defendant had a history of two kinds

---

[10] Dr. Dondershine questioned defendant "about other times that he had been in fights or been hurt or beat up, and the sound never disappeared, the sights never became altered."

of extreme emotional distress. The first kind was the nature of his upbringing, i.e., the kind of mothering or parenting that he had. The second kind was a history of specific traumatic events.

Dissociation is known to occur as a "residual symptom" in people who have been subjected to extreme stress. "It's what we see all the time." It is also well known that there is a tendency to dissociate during stressful events in children who are the products of certain types of upbringing, "as is the case here." It is also known that such children tend to search for groups with which to affiliate themselves, to replace the individuals in their pasts who were not adequately stable for them. They have a need to protect other people in exchange for being accepted and supported by them. "[S]uch individuals are likely to have . . . [an] innate reaction to come to the aid of another," especially if the other is identified with the group with which the individual wants to affiliate.

The term "dissociation" refers not only to an altered consciousness but also to a personality type or psychological state. Dissociative people do not tend to consider "[a]m I acting out of the need to protect this person, or am I responding to other events in my life?" "They de-link. . . . They are very easily able to be one way in the moment and another way in another moment, and have no problem with the inconsistencies involved." Given defendant's background, "some of the facts of the situation, and where I think [defendant's] psychological state is, there's certain things I would not expect him to do, and some of these things would be to summon up past information to inform and construct a plan that took into account consequences. Those are not things that I would anticipate under this stressful situation."

Given defendant's point of view and immaturity, it did not surprise Dondershine that defendant lied as much as he could to the police. And, in any forensic assessment, "one needs to have a healthy skepticism," and he had it. But defendant's mendacity with the police did not cause Dondershine to doubt the veracity of defendant's statements to him. Dondershine found several "interesting parallels" between defendant's statement to the police and to him. Even when defendant was finally admitting the crime, he said he did not know how many stab wounds there were. Also, over time, defendant became increasingly polite, cooperative and well mannered with the police, and the same thing happened when Dondershine interviewed defendant. Dondershine found this tendency to take on "some coloration of the people interviewing him" consistent with defendant's personality. Finally, Dondershine did not think defendant "knew anything about why he would say I saw my hand, or I don't hear sounds." Even the police would not have known the significance of that.

On cross-examination by the prosecutor, Dr. Dondershine stated that he had done several hundred forensic exams over the years, and perhaps 20 in the last year. He admitted that in this case, he had not read all of the witnesses' accounts of the stabbing; he had interviewed defendant for two hours; and the audiotape of the police interrogation he reviewed was 38 minutes long and did not contain the complete interview. While there was psychological testing he could have administered, he believed he had gathered enough information for an evaluation of defendant that was 15 to 20 pages longer than the one he had written.

The prosecutor asked Dr. Dondershine what qualified him "to make these sweeping statements about what teens do." Having already explained that his training included a year of child psychiatry, and that no psychiatrist could "ignore or be unaware of the consequences of developmental and child related issues," he added that there was quite a lot of information in the literature, and it was general knowledge of psychiatry. Perhaps in exasperation, he concluded: "But specifically other than treating people who used to be teenagers and having one of my own and having been one and the year in residency, that's about it." He explained that he did not consider defendant "an average teenager" because of the stresses affecting his personality and the problems that he has as a result of that. Because of his past experiences, things that are generally true for teenagers are true for him but to an exaggerated degree. Dr. Dondershine believed that if he were to testify at trial, he would want to fully explain the theories of personality development, how it changes based on the parenting experiences, the psychiatric impacts on individuals and what it might do to a young adult.

Dr. Dondershine described defendant as "an individual with conduct and emotional and behavioral control issues and anxiety problems related to his upbringing that can be categorized in one of several diagnoses depending." Dr. Dondershine diagnosed defendant as having an adjustment disorder with emotional and conduct problems. This diagnosis is listed in the DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, 4th ed.). However, given "such a history of prior emotional trauma and stress," Dr. Dondershine would expect to see attachment problems related to personality development, and "psychiatric problems which can be characterized as complex PTSD," or an anxiety disorder, or a "psychophysiological instability." In part, Dr. Dondershine associated the event in which defendant was assaulted by his mother's friend at age 13 or 14 with PTSD, which helped explain the dissociative state he believed defendant might have been in when he killed Carr. Dr. Dondershine admitted he did not have independent confirmation of the assault.

Dr. Dondershine was aware of defendant's prior juvenile record for committing batteries. Asked if defendant "could do that regardless of the fact

he had a dysfunctional childhood and other traumas in his life," the doctor replied: "Well, in this case I think that's why he's capable of doing it."

Dr. Dondershine was asked how he knew that defendant was not "malingering" or lying when he said that "he couldn't hear or see anymore during the event, and saw his hand stabbing which his brain's not associating with what he was doing?" Dr. Dondershine agreed that "malingering is always something to be suspected," but in this case he did not think defendant was malingering because "in prior fights that he had where he was either perpetrator or victim, that didn't happen. If he was malingering, he might tell me that's what always happens. [¶] Also, it's a low probability symptom. That sound changes or to view his hand, to see my hand as opposed to I did it. He could have said I saw my hand coming up as well as my hand coming down. Those are not the kind of things known by most people that they will then use those statements as malingering."

The prosecutor asked Dr. Dondershine to express an opinion about what was in defendant's mind when he stabbed the victim. He asked Dr. Dondershine: "To [a] reasonable degree of medical probability[11] in your training and experience, why did Alex Cortes stab Chris Carr 13 times?" The doctor replied that he had found in most cases of self-defense that when "one gets into a life and death situation," whatever the context, once a life-threatening rage is released, an uncontrolled life-protecting behavior starts. "It comes from the center of the brain below the cortex and it is . . . dangerous, and it is not remembered, and the normal mental state doesn't occur until the threat is over."

He admitted that his opinion presupposed that defendant *thought* his life was being threatened, whether it actually was or not. "Whether he perceived correctly or misperceived [is] sort of a question of fact. If he believed that his life was in danger, whether it was or wasn't from a psychiatric point of view is irrelevant. The stress is from his belief in the situation." That belief does not have to be cognitive, as in a self-statement such as "I am about to die." It could also be a "somatic sensory event, just a feeling that can't be put into words." That feeling could recall the traumatic event when defendant was 14. "[I]f that event occurred and his report is accurate, . . . that trauma would exist as a somatosensory recall. And if he's put in a situation of major threat, those old emotions would take over and aggravate the sense of imminent annihilation."

---

[11] Dr. Dondershine had explained that when he used the term "psychiatrically likely," he meant "to a reasonable degree of medical probability."

*The Trial Court's Ruling*

The trial court stated: "I don't draw any semantic distinction between a dissociative state, a fugue state and diminished capacity, and . . . section 29 is aimed at getting rid of diminished capacity defenses and claims . . . by experts diagnosing defendants as having diminished capacity." In accordance with this view, the trial court adopted the prosecutor's written objections and incorporated them into its ruling point by point. The court's ruling not only prohibited Dr. Dondershine from testifying that defendant was suffering from diminished capacity; it also prohibited Dr. Dondershine from testifying about defendant's upbringing, traumatic events in his life or their effect on his mental condition at the time of the crime, *at all*.

Specifically, with respect to dissociation and PTSD[12] the trial court ruled Dr. Dondershine could not testify that (1) defendant was in a dissociative state; or (2) exhibited any kind of behavior that established a foundation for a finding that he was in a dissociative state; or (3) to any hypotheticals, "[be]cause that's just leading to linking up an opinion"; or (4) it is psychiatrically likely defendant's mental functioning was overwhelmed and impaired, because it goes to his state of mind before the crime; (5) defendant has a history of extreme emotional distress, bad upbringing and mothering, because the court doubted that Dr. Dondershine spent enough time with defendant to have an

---

[12] For example, the trial court ruled with respect to self-defense that Dr. Dondershine could not testify that there is psychiatric evidence that supports the likelihood that defendant was acting in self-defense, because that is counter to section 29; that it is psychiatrically likely that defendant acted out of fear, not anger, because it runs afoul of sections 28 and 29; (8) that it is psychiatrically likely defendant did not anticipate that he would become a target of the attack; that defendant's behavior, taken in its entirety, was consistent with self-defense.

Likewise, with respect to teenagers in general or defendant in particular, the trial court ruled that Dr. Dondershine could not express any opinion about how teenagers think·or act because Dr. Dondershine had no more expertise concerning teenagers than anybody else. For the same reason, he could not testify that defendant was not a normal teenager. Nor could he testify that that defendant is more teen than adult, more empathetic than cold, more follower than leader, "because how he is now is not relevant . . . , and I don't know that Dr. Dondershine has a . . . sufficient foundation to testify about how he was before the crime was committed"; (5) that defendant is chronically anxious but not particularly angry, because "that's how he is today."

The court also ruled that Dr. Dondershine could not testify that it is not significant defendant lied as much as he could during police interrogation; that PTSD applied only in part to the doctor's findings, and that Dr. Dondershine only listened to 38 minutes of defendant's statements and read no witness accounts, which would be admissible as impeachment, except that Dr. Dondershine was not going to testify about defendant's behavior; and about drugs, for the same reason, except that if defendant testified drug use was a factor in his behavior, then the prosecutor could explore this with Dr. Dondershine "only for the purpose of demonstrating that it wasn't sufficiently important to the defendant" to tell his retained psychiatrist about it.

Inasmuch as appellate counsel "does not specifically assert . . . that any of these specific findings were erroneous," but rather "complains about additional restrictions which the court incorrectly imposed upon Dondershine," we do not rule on the correctness *vel non* (or not) of all of the trial court's rulings.

adequate foundation to testify about "any of that"; or (6) defendant has a history of emotional distress, including PTSD; or (7) defendant had PTSD at the time of the act or that in his past there were any particular features that met those criteria, except to the extent that the jury was going to hear about his prior bad acts; or (8) Dr. Dondershine diagnosed defendant with an adjustment disorder involving conduct and emotional control issues, because "that's essentially the same as his testimony about a dissociative state"; or (9) defendant experienced an emotional trauma leading to a somatic sensory recall of some incident, because Dr. Dondershine was not going to be allowed to render any opinion about defendant and his behavior; or (10) why defendant stabbed the victim 13 times.

As for "[w]hat Dr. Dondershine can testify to," the court ruled that, "assuming there's evidence that makes his opinion relevant," Dr. Dondershine could testify "that there is such a thing as a dissociative state and that, in general, in the population at large, when that condition exists, it has the following characteristics and can have the following effects on a general person's behavior who might have that symptom." Dr. Dondershine could also define PTSD and testify "about the kinds of things that in general, in the general population, might lead to a posttraumatic stress disorder."

*Trial Testimony*

Consistent with the trial court's ruling, Dr. Dondershine testified as an expert in forensic psychiatry with extensive experience in PTSD. He testified that one common reaction of people to very traumatic situations is dissociation. It is often an "automatic reaction that's built in if the stress is enough that the people dissociate when that happens. . . . [I]t usually occurs in the midst of the trauma and often ends when safety arise[s]." The purpose of the dissociative state is protective, since it allows people to survive difficult situations, but a certain number of people will develop a dissociation disorder, which occurs "[w]hen dissociation continues and becomes part of the person's problem."

Dissociation disorder is defined as an "altered state of consciousness, an impairment in consciousness." It means "de-linking parts of the mind that usually work together." When there is an alteration in consciousness, then memory, perceptive faculties and sensation are adversely affected. If delinking or dissociation happens, a person can be partially conscious but without awareness of consequences or planning. The person may not be able to summon up a memory, or encode new facts as memory, which is important in making decisions. As a result, a person can act without conscious volition. The reaction is probably built in, because under an extreme threat it would not be survival related for "the fancy part of the brain to work, to sit and

think about consequences and intentions. So there's a built-in mechanism to turn that off and to have the brain go [into] survival-related actions that can occur very quickly with limited thought."

Dissociation can cause changes in perception. One is lack of pain. Vision can become blurry or "super clear" and "tunnel-like." There is a sensation of observing oneself. Or, a lot of people say, "I went on automatic." The behavior comes from deeper brain structures and runs its course. It is repetitive destructive behavior that does not end until the threat is gone. So, if there is one shot, or punch, or bite, there may be 40.

A typical dissociative state lasts just as long as the threat is extreme, which could be seconds or minutes. There is a built-in chemical that is supposed to turn it off quickly. But if the person's stress system is damaged already, the state can go on for minutes. Such a person tends to be sensitized to threats, and tends to react to threats more quickly.

In his experience, Dr. Dondershine worked with patients who had been in combat situations, but also some sexual abuse and family abuse cases. For a person to make the biological switch from "fancy brain to deep brain" and go into a dissociative state, the person has to perceive a major threat that is overwhelming, that life is at stake, and that there is no escape.

When the stress gets high enough, the part of the brain that produces narrative or retrievable memory fails, and memory is not encoded in the cortex and hippocampus. At that point, a person can be expected to have impairment of recallable memory.

PTSD was once considered to be a dissociation disorder, but now is recognized to be an oscillation between overremembering and underremembering. The remembering is not voluntary, or verbal; it usually emerges suddenly and is visual and emotional. But when the memory is not being released like that, it is gone. The "fancy" brain usually suppresses visceral memory, but when something happens to the "fancy" brain, the past trauma comes up as a visceral memory, years after the event. When there is dissociation and other symptoms in the face of a major trauma, it is called acute stress disorder. If symptoms persist for more than 30 days, it is called PTSD.

Following Dr. Dondershine's testimony, a juror submitted the following question: "Did Dr. Dondershine interview Alex?" The court did not answer the question. Instead, the court later gave the following instruction: "[S]ection 29 prohibits any expert from testifying in a criminal trial about a defendant's mental state at or around the time the alleged crime was committed. Such a determination shall be made solely by you as the trier of fact."

## ANALYSIS

In the many years since the adoption of sections 25, 28 and 29,[13] there has been considerable discussion in the case law concerning the proper limits those statutes place on expert testimony in a criminal case. Nevertheless, as this case demonstrates, this area of criminal law apparently continues to bedevil trial courts and practitioners alike. For that reason, it is appropriate to begin our analysis of defendant's claim by examining in some detail the facts and holdings of some of the relevant cases.

■ Eleven years ago, in *People v. Coddington* (2000) 23 Cal.4th 529 [97 Cal.Rptr.2d 528, 2 P.3d 1081] (*Coddington*), our Supreme Court summarized permissible and impermissible expert testimony on mental state evidence in criminal trials.[14] "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. [Citation.] Sections 28 and 29 *permit* introduction of evidence of mental illness when relevant to whether a defendant *actually* formed a mental state that is an element of a charged offense, but *do not permit* an expert to offer an opinion on whether a defendant had the *mental capacity* to form a specific mental state or whether the defendant *actually harbored* such a mental state. An expert's opinion that a form of mental illness *can lead to impulsive behavior* is relevant to the existence *vel non* [(or not)] of the mental states of premeditation and deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing." (*Coddington*, at pp. 582–583, italics added, fns. omitted.) Citing *People v. Nunn*

---

[13] Section 25 states in relevant part: "(a) The defense of diminished capacity is hereby abolished. In a criminal action, as well as any juvenile court proceeding, evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."

Section 28 states in relevant part: "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

Section 29 states in full: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

[14] Overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, footnote 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].

(1996) 50 Cal.App.4th 1357 [58 Cal.Rptr.2d 294] (*Nunn*), *People v. Young* (1987) 189 Cal.App.3d 891, 905 [234 Cal.Rptr. 819] (*Young*), *People v. McCowan* (1986) 182 Cal.App.3d 1, 12–15 [227 Cal.Rptr. 23] (*McCowan*), and *People v. Whitler* (1985) 171 Cal.App.3d 337 [214 Cal.Rptr. 610] (*Whitler*) for the proposition that a criminal defendant's federal constitutional right to present a defense is not violated by the "exclusion of expert testimony on the ultimate question of fact as to whether appellant did form those mental states," the *Coddington* court concluded: "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. *They preclude only expert opinion that the element was not present.*" (*Coddington*, at p. 583, italics added.)

On its facts, the *Coddington* court ruled that the trial court's ruling below "was an overly restrictive reading of the statutory limitations on admission of evidence of mental illness." (*Coddington, supra,* 23 Cal.4th at p. 582.) There, the trial court had ruled that "the defense could offer any relevant evidence on mental defect or disease. However, no questions could be asked of the expert by either appellant or the People about whether or how such defect or disease would affect *the defendant's mental state or actuality,* or if it would impair *his ability to form an intent, deliberate, or premeditate,* unless the psychiatrist would testify, out of the presence of the jury, that he believed that appellant did not premeditate and deliberate the killings. The court extended that ruling to preclude any hypothetical questions regarding the effect of mental defect or illness on a person's ability to deliberate or premeditate." (*Ibid.,* italics added.)

Other California Supreme Court cases have echoed *Coddington*'s view of sections 28 and 29. (See, e.g., *People v. Hernandez* (2000) 22 Cal.4th 512, 520 [93 Cal.Rptr.2d 509, 994 P.2d 354] ["at the guilt phase, a defendant may present evidence to show that he or she lacked the mental state required to commit the charged crime"]; *People v. Vieira* (2005) 35 Cal.4th 264 [25 Cal.Rptr.3d 337, 106 P.3d 990]; cf. *People v. Halvorsen* (2007) 42 Cal.4th 379, 402 [64 Cal.Rptr.3d 721, 165 P.3d 512] [expert testified that defendant suffered from bipolar disorder and was psychotic at the time of the offenses]; see also *People v. Ochoa* (1998) 19 Cal.4th 353, 431 [79 Cal.Rptr.2d 408, 966 P.2d 442] ["By its terms, section 29 prohibits an expert witness from giving an opinion about the ultimate fact whether a defendant had the required mental state for conviction of a crime. It prohibits no more than that."].)

The Court of Appeal cases cited by the *Coddington* court are instructive, insofar as they provide concrete examples of the limits imposed by the statutes in question and the *Coddington* opinion. For example, in *Nunn*, the

prosecutor objected that sections 28 and 29 prevented the expert from stating, as he did in his report, that given the defendant's history, his " 'tendency to overreact, coupled with his level of inebriation, resulted in his impulsive firing of the weapon.' " (*Nunn, supra*, 50 Cal.App.4th at p. 1362.) The trial court agreed and instructed Dr. Lipson that "his opinion that appellant had fired impulsively was inadmissible since it was a conclusion concerning appellant's intent at the time of the shooting." (*Ibid.*) However, the court also told Dr. Lipson that he "was free to testify to his other findings and conclusions." (*Ibid.*) At trial, Dr. Lipson "testified extensively concerning appellant's background and mental condition. He stated appellant experienced several traumatic incidents related to his service with the Navy during the Vietnam War. Lipson stated such experiences can result in a person overreacting to subsequent stressful events." (*Ibid.*) Over the prosecutor's objection that the expert "was testifying to appellant's state of mind," the trial court ruled that "it was proper for the defense to present evidence concerning appellant's mental condition and the effect such condition would have on his state of mind at the time of the shooting. What the expert could not do was give his opinion concerning whether the defendant did or did not act with a specific intent or mental state." (*Id.* at pp. 1362–1363.)

The *Nunn* court approved the trial court's rulings, holding that sections 28 and 29 "allow the presentation of detailed expert testimony relevant to whether a defendant harbored a required mental state or intent at the time he acted. Thus, in the present case it was permissible for Dr. Lipson to opine that appellant, because of his history of psychological trauma, *tended to overreact* to stress and apprehension. It was permissible for him to testify *such condition could result* in appellant acting impulsively under certain particular circumstances. Dr. Lipson *could have evaluated* the psychological setting of appellant's claimed encounter with the men at the fence and could have offered an opinion concerning whether that encounter was the type that *could result* in an impulsive reaction from one with appellant's mental condition. What the doctor *could not do*, and what the defense proposed he do here, was to conclude that appellant *had acted impulsively*, that is, without the intent to kill, that is, without express malice aforethought. The court acted properly in excluding Dr. Lipson's opinion that appellant fired his weapon impulsively." (*Nunn, supra*, 50 Cal.App.4th at p. 1365, italics added.)

In *Young*, the defendant complained on appeal that the trial court unduly restricted the testimony of two defense experts, Drs. Stalberg and Sharma, by refusing to allow defense counsel to ask the doctors whether the defendant's medical illness in any way interfered with his having malice on the night of the offenses. The *Young* court rejected the contention, noting that the defendant "was not prohibited . . . from introducing evidence as to his mental condition on July 27, 1984. Dr. Stalberg did testify that on the date of the charged offenses appellant suffered from a mental disease described as

chronic paranoid schizophrenia. Dr. Stalberg described in detail how he arrived at his diagnosis and the characteristics of chronic paranoid schizophrenia. [¶] Appellant's history of delusions were described by Dr. Stalberg . . . . Dr. Stalberg was allowed to testify he doubted appellant planned his conduct, because such bizarre behavior tends to be impulsive. [¶] In Dr. Stalberg's opinion, appellant's mental condition substantially affected his judgment and social behavior, and appellant's reasoning was psychotic. Appellant had suffered from schizophrenia since before 1983. Appellant engaged in obsessive behavior on July 27, 1984 . . . . [¶] Dr. Sharma's testimony covered the same areas as were covered by Dr. Stalberg . . . . [¶] Dr. Sharma believed appellant's mental illness affected appellant's reasoning at the time of the charged offenses. Appellant's behavior controls were impaired and he engaged in compulsive behavior." (*Young, supra,* 189 Cal.App.3d at pp. 906–907.)

The *Young* court concluded that the defendant had been "afforded the opportunity to present to the jury the relevant evidence as to his mental condition on July 27, 1984. [Citations.] Although the psychiatrists were not allowed to express an opinion on appellant's ability to premeditate or harbor malice, '[T]hey did present lengthy testimony describing [appellant's] mental illness and its effect on his conduct.' [Citation.] The trial court properly conducted the trial in accordance with the limitations of . . . sections 25, 28 and 29." (*Young, supra,* 189 Cal.App.3d at p. 907.)

In *McCowan,* the trial court ruled, in reliance on sections 25, 28, and 29, that the defense could not " 'ask any psychiatrists or other expert on mental condition a question as to whether or not the defendant had the capacity to form a mental state in issue here on the date of the alleged commission of the offense.' " (*McCowan, supra,* 182 Cal.App.3d at p. 11.) The court also barred expert testimony " 'as to whether or not the defendant did or did not form the required mental state at the time of the alleged commission of the act.' " (*Ibid.*) However, the record disclosed that "defendant was permitted to present evidence suggesting that his mental condition prevented him from forming the required mental state at the time he committed the offenses. Dr. Galioni testified that his mental disorder, a 'major depressive episode,' had a significant impact on his mental process the night of the shootings. According to Galioni, defendant essentially was out of control, unable to think clearly or make judgments without great difficulty. The cause of his condition was the existence of numerous, intense pressures and stresses." (*Id.* at p. 13.) The appellate court found no error.

In *Whitler,* "[d]efendant was permitted to produce psychiatric testimony regarding her mental condition at the time of the killing. She was precluded only from introducing capacity evidence and from asking her psychiatric

experts whether she had the requisite mental state at the time of the shooting." (*Whitler, supra,* 171 Cal.App.3d at pp. 341–342.) Again, the Court of Appeal found no error. (See also *People v. Rangel* (1992) 11 Cal.App.4th 291, 303 [14 Cal.Rptr.2d 529] [extensive expert testimony permitted as to the effects of alcohol generally and specifically upon appellant's actual state of mind, coupled with testimony by toxicologist that a person with a blood-alcohol level of 0.22 percent or thereabouts might misperceive data, draw faulty conclusions, and make poor or rash decisions based thereon].)

We also find two additional cases instructive. In *People v. Jackson* (1984) 152 Cal.App.3d 961 [199 Cal.Rptr. 848], the trial court barred defense psychiatrists from offering an opinion on whether the defendant's mental defect prevented him from having specific intent, malice aforethought or premeditation. (*Id.* at p. 965.) However, the trial court did permit extensive testimony that the defendant was a chronic paranoid schizophrenic with a long history of compulsive thoughts and behaviors who, on the day in question, was gripped by certain delusions. One psychiatrist testified that "Jackson's conduct was 'absolutely' a product of his mental disease"; the other psychiatrist agreed, opining that "Jackson's 'act was the product of a psychotic compulsion as a result of his chronic paranoid schizophrenia.' He defined compulsion as 'an act that an individual is driven or forced to carry out by inner psychological mechanisms and an act over which that individual has little or no control, [a] nearly involuntary act.' " (*Id.* at p. 965.)

The *Jackson* court held that sections 28 and 29 did not violate the defendant's constitutional rights by barring capacity testimony and prohibiting an expert from testifying that the defendant did not have the requisite mental state at the time of the offense. Moreover, the defendant had no cause to complain because the experts were permitted to testify that his act was the product of his mental disorder. (*People v. Jackson, supra,* 152 Cal.App.3d at pp. 969–970.)

In *People v. Aris* (1989) 215 Cal.App.3d 1178 [264 Cal.Rptr. 167] (*Aris*), the defendant, a battered woman, killed her abusive husband while he slept. She was convicted of second degree murder. (*Id.* at p. 1183.) The trial court excluded the defense expert's opinion that she was a battered woman, as well as evidence " 'explaining how the psychological impact of being a battered woman affected her perception of danger at the time she shot her husband.' " (*Id.* at p. 1193.) Dr. Walker, the foremost authority on battered woman syndrome (BWS), was only permitted to testify in general about the definition of BWS, its symptoms, and the behaviors associated with it.[15] (215

---

[15] The expert, Dr. Lenore E. Walker, testified that BWS is not listed as a mental illness in the DSM-III (Diagnostic and Statistical Manual of Mental Disorders, 3d ed.), to avoid stigmatizing abuse victims, but it was nevertheless "a proper diagnosis and is recognized as *a*

Cal.App.3d at pp. 1194–1195.) She was not permitted to relate BWS to the defendant or to self-defense, apparently on the ground that it would violate section 29. (215 Cal.App.3d at p. 1197, fn. 4.)

The *Aris* court found this exclusion of evidence to be error. (*Aris, supra,* 215 Cal.App.3d at p. 1185.) The appellate court reasoned that Dr. Walker's opinion—that as a battered woman, the defendant reasonably perceived herself to be in danger—"slightly reframed [was] highly relevant to the first element of self-defense—defendant's actual, subjective perception that she was in danger and that she had to kill her husband to avoid that danger. Not only is the opinion relevant to the excuse of imperfect self-defense which requires only an actual perception, but also the justification of complete self-defense because it requires both actual as well as reasonable perception. [¶] The relevance to the defendant's actual perception lies in the opinion's explanation of how such a perception would reasonably follow from the defendant's experience as a battered woman. This relates to the prosecution's argument that such a perception of imminent danger makes no sense when the victim is asleep and a way of escape open and, therefore, she did not actually have that perception. [¶] However, Dr. Walker's opinion is inadmissible to the extent that it is testimony 'the defendant had or did not have . . . malice aforethought . . . .' (§ 29.) Since having an actual perception that one is in imminent danger negates malice aforethought [citation], we hold that Dr. Walker was properly prohibited from stating an opinion that defendant actually perceived that she was in imminent danger and needed to kill in self-defense. [¶] Nevertheless, it was error not to permit Dr. Walker to testify, based on her experience and BWS theory, as to how the defendant's particular experiences as a battered woman affected her perceptions of danger, its imminence, and what actions were necessary to protect herself. An expert's opinion about a defendant's mental state does not violate section 29 as long as the expert does not express an opinion on the ultimate issue that defendant did or did not have a mental state required for a charged offense. [Citations.] Dr. Walker's proposed testimony that defendant was a battered woman . . . affected defendant's perceptions and conduct stops short of the ultimate issue of what defendant's perception actually was and, therefore, does not violate section 29." (*Id.* at pp. 1197–1198.)[16]

---

*type of posttraumatic stress disorder,* which is listed and defined in the DSM-III and which happens to anyone exposed to the degree and kind of trauma, such as a natural disaster or combat, that would be expected to cause psychological problems." (*Aris, supra,* 215 Cal.App.3d at p. 1194, italics added.)

[16] *Aris* also held that evidence of BWS was not relevant to the objective reasonableness of the defendant's perceived need to defend himself or herself. This latter holding was disapproved in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088–1089 [56 Cal.Rptr.2d 142, 921 P.2d 1]: "[A]s with any evidence, the jury may give this testimony whatever weight it deems appropriate in light of the evidence as a whole. The ultimate judgment of reasonableness is solely for the jury. We simply hold that evidence of battered women's syndrome is

We review the trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Vieira, supra*, 35 Cal.4th at p. 292.) Our analysis of the trial court's ruling necessarily starts with the plain language of sections 25, 28 and 29. Sections 25 and 28 *do* prohibit the admission of evidence of the defendant's "intoxication, trauma, mental illness, disease, or defect" if its purpose is "to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged" (§ 25, subd. (a)) or "with which the accused committed the [crime]" (§ 28, subd. (a)), or "required . . . for the crimes charged" (§ 29). In other words, the defendant cannot put on an expert to testify that, because of his mental disorder or condition (for example, dissociation, or PTSD), he or she did not have the ability, or capacity, to form or harbor whatever mental state is a required element of the charged offense, such as intent to kill, or malice aforethought, or premeditation, or deliberation.

■ On the other hand, such evidence *is* admissible for the sole purpose of showing ("solely on the issue of") "whether or not the accused actually formed a required specific intent, premeditated, deliberated or harbored malice aforethought, when a specific intent crime is charged" (§ 28, subd. (a)), except that an expert who testifies "about a defendant's mental illness, mental disorder, or mental defect" (for example, dissociation or PTSD) "shall not testify as to whether the defendant had or did not have the required mental states . . . for the crimes charged." (§ 29.) In other words, the defendant *can* call an expert to testify that he had a mental disorder or condition (such as PTSD or dissociation), as long as that testimony tends to show that the defendant did or did not in actuality (as opposed to capacity) have the mental state (malice aforethought, premeditation, deliberation) required for conviction of a specific intent crime (as opposed to a general intent crime) with which he is charged, except that the expert cannot offer the opinion that the defendant actually did, or did not, harbor the specific intent at issue. Put differently, sections 28 and 29 do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged.

---

generally *relevant* to the reasonableness, as well as the subjective existence, of defendant's belief in the need to defend, and, to the extent it is relevant, the jury may *consider* it in deciding both questions. The court's contrary instruction was erroneous. We disapprove of *People v. Aris, supra*, 215 Cal.App.3d 1178 . . . to the extent [it is] inconsistent with this conclusion."

No case has been cited to us, nor have we found one ourselves, which even remotely suggests that it is proper under sections 25, 28 and 29 to preclude *all* testimony about the accused's own diagnosis, or mental condition, at the time of the offense, but instead limit the expert's testimony to diagnoses or mental conditions "in the population at large," and their "effects on a general person's behavior who might have that symptom." Indeed, it appears to us that section 29, in particular, presupposes that the expert will testify about "[*the*] *defendant's* mental illness, mental disorder, or mental defect" (§ 29, italics added) and not only about the behavior of some "general person" in the "population at large." The trial court abused its discretion in refusing to permit Dr. Dondershine to testify about defendant's particular diagnoses and mental condition and their effect on him at the time of the offense, and in limiting Dr. Dondershine's testimony to diagnoses or mental conditions in the abstract and their effects on the general person in the population at large. That much is clear.

The more difficult question is: how much of Dr. Dondershine's testimony should the trial court have admitted? As always, the devil is in the details.

Defendant points out that he was not seeking an expert opinion as to whether he had the capacity to form, or actually formed, any of the required mental states at issue at trial, i.e., malice aforethought, premeditation or deliberation. Rather, he sought only admission of testimony "that Cortes had entered a dissociative state *after* he began to stab Carr as a means of explaining the multiple stab wounds inflicted during the altercation. [S]uch evidence involved a form of mental illness or disorder which had arguably led to the impulsive stabbing behavior once the stabbing began, but did not go to describing or defining the mental state existing prior to or at the moment of the offense's commission." Analogizing the facts of this case to those in *Nunn*, *Whitler*, *Aris* and *Jackson*, defendant argues that Dr. Dondershine should have been permitted to opine (1) that defendant was acting out of fear not anger at the time of his confrontation with Carr, (2) that it was likely his mental function was impaired and that he was emotionally overwhelmed because of the context of the event, given his prior psychiatric background, and (3) that the phenomenon reported by defendant—observing his hand, not hearing any sounds—was consistent with the recognized psychiatric condition of dissociation.

As noted previously, the Attorney General agrees that defendant had a right to have Dr. Dondershine "testify that [defendant] was in a dissociative state when he stabbed Chris," citing *Coddington*. He also concedes that "[t]heoretically," defendant could have presented evidence "that he was in a dissociative

state and such states *sometimes* interfere with a person's ability to form intent; *or* evidence that dissociative states prevent persons from forming intent and appellant *may* have been in such a state." But, he argues, Dr. Dondershine could not testify that persons in a dissociative state "lose their volition and go on automatic," because "[s]uch testimony would have been tantamount to testifying that appellant did not have the mental state required by the crime charged and would have violated section 29."

We start from the premise that, at a minimum, Dr. Dondershine should have been permitted to testify to defendant's diagnoses of adjustment disorder with emotional and conduct problems, attachment problems related to personality development, and psychiatric problems that could be characterized variously as PTSD, anxiety disorder or psychophysiological instability. He should have been permitted to testify about defendant's upbringing and traumatic experiences as a child and/or adolescent, inasmuch as defendant's prior traumatic experiences informed Dr. Dondershine's opinion, and explained the connection between defendant's diagnoses, his mental state and his behavior. He should have been permitted to explain both the psychological condition and the phenomenon of dissociation, and dissociation's relationship to PTSD and defendant's upbringing and traumatic experiences. He should have been permitted to explain the bases for his opinions, including defendant's statements describing his perception of the stabbing. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1324–1330 [77 Cal.Rptr.3d 14].)

■ Relying on dicta in *Nunn, supra,* 50 Cal.App.4th at page 1364, the Attorney General maintains that an expert cannot offer any opinion that could be interpreted as "tantamount" to testifying that the defendant did not have the mental state required by the crime charged, or had a state of mind that is the opposite of, or necessarily negates, the existence of the required mental state. However, as interpreted by the high court in *Coddington,* sections 28 and 29 in fact leave an expert considerable latitude to express an opinion on the defendant's mental condition at the time of offense, within the confines, of course, of its twin prohibitions: no testimony on the defendant's capacity to have, or actually having, the intent required to commit the charged crime. "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. *They preclude only expert opinion that the element was not present.*" (*Coddington, supra,* 23 Cal.4th at p. 583, italics added.) "By its terms, section 29 prohibits an expert witness from giving an opinion about the ultimate fact whether a defendant had the required mental state for

conviction of a crime. *It prohibits no more than that.*" (*People v. Ochoa, supra*, 19 Cal.4th at p. 431, italics added.)

Thus, as both defendant and the Attorney General agree, Dr. Dondershine should have been permitted to testify that in Dondershine's opinion, defendant entered a dissociated state. He should also have been able to testify, as he did, about dissociation: its physiological basis, it psychosocial basis, and its behavioral manifestations even if, as Dr. Dondershine testified, "a lot of people" who have reported experiencing dissociation have described it as "I went on automatic." And, "[*i*]*f* de-linking or dissociation happens," a person's memory *can* be impaired, and *can* cause the person to act without conscious volition. (Italics added.)

This type of testimony is not different in any meaningful way from the testimony in *Jackson*, that the defendant was a chronic paranoid schizophrenic with a long history of compulsive thoughts and behaviors whose criminal act was the product of a psychotic compulsion, which was defined as " 'an act that an individual is driven or forced to carry out by inner psychological mechanisms and an act over which that individual has little or no control, [a] nearly involuntary act.' " (*People v. Jackson, supra*, 152 Cal.App.3d at p. 965.) Nor is it different from the testimony in *Young*, that the defendant suffered from a schizophrenic disorder which gave rise to a fixed false belief, hallucinations, disorganized thinking, suspicion and distrust, that affected the defendant's reasoning at the time of the charged offenses and impaired his behavior controls, causing him to engage in compulsive behavior; or the testimony in *McCowan*, that due to the numerous intense pressures and stresses the defendant was under, he suffered from a major depression which had a significant impact on his mental process the night of the shootings, causing the defendant to be essentially out of control, unable to think clearly, or make judgments without great difficulty.

Here, the defense also offered expert testimony that; in effect, defendant's traumatic experiences as an abused adolescent caused him to suffer several DSM-IV diagnosable conditions which were (a) likely to have colored his perceptions of the situation, and (b) impaired his consciousness in specific ways. Such testimony is very similar to the expert testimony erroneously excluded in *Aris*, and *Humphrey*, that the defendants' experiences as battered women affected their perceptions of danger, its imminence, and what actions were necessary to protect themselves, and from which a jury might infer that the defendants did, in fact, act in self-defense, either perfect or imperfect.

The gist of the Attorney General's complaint about Dr. Dondershine's proposed testimony is that it would have given the jury a basis *to infer* that defendant actually did not harbor malice, premeditate, or deliberate, even if Dr. Dondershine did not come out and say that defendant lacked such mental states. That is exactly right. However, such testimony is not "clearly prohibited by sections 25, 28, and 29." On the contrary, it is exactly the type of testimony sections 28, 29, and the case law, permit. In all of the cited cases, evidence was presented from which the jury could have properly inferred, from testimony that fell short of expressing an opinion that the defendant lacked the specific intentional state required for the charged crime, that the defendant actually lacked such intent. The limits placed by the trial court on Dr. Dondershine's testimony were unduly restrictive and an abuse of discretion.

Was the error prejudicial? In this case, we conclude it was. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Coddington, supra,* 23 Cal.4th at pp. 583–584.) First, the trial court's ruling effectively eviscerated any defense defendant had to premeditated and deliberated murder. By prohibiting any testimony about defendant's mental condition, the court's ruling robbed Dr. Dondershine's testimony of any relevance it might otherwise have had, since it left the jury no basis to infer that defendant had lapsed into a dissociated state in which he might not have deliberately premeditated the infliction of 13 wounds on the victim. The court's ruling also prevented the jury from properly evaluating evidence that would have been relevant to its consideration of the self-defense, imperfect self-defense and heat of passion instructions given here.

The prosecutor took full advantage of the court's ruling in closing argument. He admitted that the case for first degree murder rested on two pieces of evidence—(1) defendant's statements to Gates and (2) the number of stab wounds—and he challenged the defense to explain them. In response to the defense argument that a dissociative state explained why defendant kept stabbing, the court's ruling allowed the prosecutor to argue that there was no alternative explanation for defendant's infliction of 13 stab wounds, *except* premeditation and deliberation. He dismissed Dr. Dondershine's testimony as "a lot of general information." He argued that PTSD was about warfare, not defendant, and repeatedly denigrated the evidence about defendant's upbringing as so much whining: "Like, you're going to fall for that [(defendant's testimony)] and give him a break: 'Let's feel sorry for him. He's had a rough life.' " "[A]ll he can say is, when asked by the police over and over again, 'Why, Why? Why,' instead of saying the story they're still trying to spin [(about self-defense)], what does he say? 'I had shitty parents. My mom did drugs. My mom's boyfriend knocked me around once when I was 13 years

old.' [¶] That's it? That justifies pulling out a knife and stabbing Chris?" Finally, the prosecutor asked the jury: "[D]id Dr. Dondershine help you understand anything about what the defendant did that night? And the answer is no. It was interesting in its own way."

The case for premeditated and deliberated murder, as opposed to second degree murder or voluntary manslaughter, was not overwhelming. Defendant's statements to Gates were as supportive of an intent to fight as of a premeditated, deliberated intent to fight to the finish. Defendant and the victim had no history of animosity before that night. The testimony of the percipient prosecution witnesses established very little other than that defendant, or possibly someone else, but certainly not Carr, threw the first punch; and that the fight was over very quickly. Furthermore, the pathologist's surmises about how the stab wounds were inflicted were not borne out by the testimony of the percipient witnesses. The critical piece of evidence was the number of stab wounds. It was for the jury to determine whether those wounds were inflicted after defendant " 'weigh[ed] and consider[ed] the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide[d] to and commit[ted] the unlawful act[s] causing death.' " (*People v. Daugherty* (1953) 40 Cal.2d 876, 901–902 [256 P.2d 911].) In our view, Dr. Dondershine's excluded testimony could well have offered the jury a basis to infer an alternative explanation for the number of wounds inflicted on the victim besides premeditation and deliberation. However, as the prosecutor so aptly pointed out, Dr. Dondershine's truncated testimony did not do that. Under *Watson,* we find it reasonably probable that defendant would have obtained a more favorable result if the jury had been permitted to hear about his diagnoses and mental condition on the day of the offense. Therefore, we will reverse on this ground.

After oral argument, we asked the parties to brief the question whether, assuming this court found the error prejudicial, we should reverse the judgment without any special directions to the trial court, or whether we should instead direct the trial court to permit the prosecutor to elect either retrial or a reduction of the offense to voluntary manslaughter or second degree murder. Defendant requests that we reverse the judgment with directions requiring the People to elect between retrial and a reduction of the offense to voluntary manslaughter. The People argue against reversal, but request a reversal without election if the judgment is to be reversed. We conclude that reversal without directions is the appropriate outcome in this case, to permit a retrial on the full range of available verdicts if the parties so choose.

Defendant raises three other issues in this appeal. Because they may arise again if there is retrial, we will briefly address them.

*Shackling*

The trial court ordered that defendant's leg be shackled under his pants during trial. The court's stated reasons were defendant's juvenile history, his impulse control issues, the lack of security in the courthouse, and the need to have three bailiffs if defendant were not shackled. When both sides had rested, the trial court instructed the jury that defendant was "physically restrained" and "in custody."[17] The record does not disclose a defense request for this instruction.

Defendant argues that the court abused its discretion in ordering the shackles without a showing of manifest need, and in giving the instruction in the absence of any indication that the jury saw the shackles. (*People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322]; *People v. McDaniel* (2008) 159 Cal.App.4th 736 [71 Cal.Rptr.3d 845] (*McDaniel*).) He also argues the error was prejudicial. (*McDaniel*, at pp. 746–747.) The Attorney General concedes that "the trial court erred because it ordered the shackling without holding a hearing to admit evidence on the need for restraints," citing *People v. Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351]. He also agrees the court erred in giving the instruction "even though the jury never saw the shackling." (See *People v. Duran*, at pp. 291–292.)

We agree with the parties that the court erred. On remand, if shackling is again under consideration, the trial court should have a hearing to determine if manifest need exists. If the court concludes that it does, and defendant is shackled, the court should not instruct the jury that defendant has been shackled, unless defendant requests the instruction, and/or the shackles have not been concealed from view. (*People v. Duran, supra,* 16 Cal.3d at pp. 291–293.)

*Prosecutorial Misconduct*

The trial court ruled inadmissible any evidence about "gang affiliation, gang name-calling, use of the word 'scrap,' . . . because it's all irrelevant to

---

[17] The court gave CALCRIM No. 337 as follows: "When defendant testified, he was physically restrained and was in custody. Do not speculate about the reason. The fact that a witness is in custody does not by itself make a witness more or less believable. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations. Evaluate the witness's testimony according to the instructions I have given you."

this case." On direct examination by the prosecutor, Forest Gleitsman testified that defendant told the victim, "Fuck you. West Side Santa Cruz, fool," and the victim replied "I don't care about West Side." There was a sidebar conference, but no objection. Before defense witness Greg Gomez testified, the prosecutor asked if Gomez could testify that defendant introduced himself as Alex Cortes from the west side. The court did not clearly rule that he could not. On cross-examination, the prosecutor asked Gomez: "And when you say he introduced himself, didn't you say he said, 'I am Alex Cortes from the west side?' " Defense counsel objected and the court admonished the jury to disregard the last question and response. The prosecutor then restated his question to avoid the reference to west side, but the witness's answer repeated the phrase. This time there was no objection. Afterwards, the prosecutor indicated that he was not trying to violate the court's ruling, but was still assuming he could ask questions about what people said that night. Defense counsel maintained the prosecutor violated the court's ruling. The court responded: "This one's a little harder because the defendant's saying it unsolicited. And so it's not going to happen again. Thank you."

█ " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.] '[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970 [77 Cal.Rptr.2d 25, 959 P.2d 183], disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

The prosecutor did not commit misconduct here. The court's ruling did not clearly prohibit the prosecutor from eliciting testimony from the witnesses about what defendant and others said on the night of the stabbing, even if their testimony referenced "the west side." On the one hand, defendant's reference to the west side was relevant to show that he exhibited a menacing or belligerent attitude. On the other hand, the comment's menace or belliger-

ence was in large part attributable to the fact that it obliquely suggested that he was involved in a gang. In our view, on remand the court will need to decide whether the relevance of references by defendant and others to the west side is outweighed by its potential to stigmatize defendant as a gang member, to his prejudice, and rule clearly on the issue. (Evid. Code, § 352.)

*Evidence of Prior Fights*

Defendant argues that the trial court erred by admitting evidence of the three fights in which he engaged while he was in high school, because the high school fights were not sufficiently similar to the mortal fight to be admissible on motive, intent, or common plan or scheme of fighting. We disagree.

"The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each in-stance." ' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) Here, the prior fights were sufficiently similar to the charged offense to permit an inference that defendant did not act accidentally, inadvertently, in good faith or in self-defense when he attacked the victim. The prior incidents were not more inflammatory than the charged offense, or more prejudicial than probative. The trial court did not abuse its discretion in admitting the evidence.

## CONCLUSION

The trial court erred in unduly restricting expert testimony on defend-ant's mental condition at the time of the offense and the error prejudiced his ability to mount a defense to first degree murder. The trial court also erred in failing to conduct a hearing to determine whether a manifest need to shackle defendant at trial existed, and in instructing the jury that defendant was restrained. The prosecutor did not commit misconduct. The trial court did not err in admitting evidence of defendant's prior fights.

## DISPOSITION

The judgment is reversed.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.