Filed 2/16/16  P. v. Schlensker CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EMBER DAWN SCHLENSKER,<br><br>Defendant and Appellant. | F068799<br><br>(Super. Ct. No. CRF39351)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Jeffrey Grant, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### *INTRODUCTION*

In January 2013, the Tuolumne County District Attorney filed a 45-count information charging Ember Dawn Schlensker (appellant) with committing various

sexual offenses against John Doe (John), between August 1, 2009, and March 1, 2012, beginning when appellant was around 25 years old and John was around 15 years old.

In July 2013, a jury convicted appellant of 27 of the 45 counts charged in the information, acquitted her of five counts, and was unable to reach a verdict as to 13 counts. The majority of appellant's convictions represented offenses alleged to have occurred during specific months between August 1, 2009, and August 21, 2010. The counts on which she was acquitted, or on which the jury was unable to reach a verdict, represented offenses alleged to have occurred during specific months between August 22, 2010, and March 31, 2012. The trial court sentenced appellant to a total prison term of six years.

Appellant raises three contentions on appeal. First, she contends the trial court abused its discretion in refusing to hold an evidentiary hearing on proffered evidence of John's sexual history. Second, appellant contends the trial court erred prejudicially in unduly restricting the testimony of the defense expert regarding her opinion that appellant suffered from posttraumatic stress disorder and rape trauma syndrome at the time of the offenses. Finally, appellant contends the cumulative effect of these errors requires reversal. For reasons discussed below, we agree with appellant's second contention and will reverse the judgment on that ground. In light of our conclusion that reversal is required, we need not and do not address appellant's other contentions on appeal.

### *FACTUAL AND PROCEDURAL BACKGROUND*

### I.    *The Information*

Counts 1 through 26 of the information charged appellant with committing two offenses per month—i.e., lewd act on a minor (Pen. Code,[1] § 288, subd. (c)(1)) and unlawful sexual intercourse with a minor under the age of 16 (§ 261.5, subd. (d))—

---

[1]    All statutory references are to the Penal Code unless otherwise specified.

between August 1, 2009, and August 21, 2010.[2]  Appellant was thus charged with 13 counts of lewd acts (counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25) and 13 counts of unlawful sexual intercourse (counts 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26).

Counts 27 through 43 charged appellant with committing one count per month of unlawful sexual intercourse with a minor more than three years her junior (§ 261.5, subd. (c)).  These offenses allegedly occurred between August 22, 2010, and March 31, 2012, excluding the time period between September 1, 2011, and November 30, 2011, when John was attending school in a different state.

Finally, counts 44 and 45 charged appellant with oral copulation and sodomy with a person under the age of 18 (§§ 288a, subd. (b)(1), 286, subd. (b)(1)), offenses allegedly occurring sometime between August 1, 2009, and March 1, 2012.

## II.    The Jury's Verdict

Appellant was tried by a jury and found guilty of all but two of the first 26 counts, which covered the time period between August 1, 2009, and August 21, 2010.  The jury found appellant not guilty on counts 19 and 20, the lewd act and unlawful sexual intercourse, which allegedly occurred in May 2010.

With respect to counts 27 through 43, which covered the time period between August 22, 2010, and March 31, 2012, the jury found appellant guilty on count 28, the unlawful sexual intercourse which allegedly occurred in the month of September 2010. The jury found appellant not guilty of the same offense in count 27, which allegedly occurred between August 22, 2010, and August 31, 2010, and not guilty of the offenses in counts 40 and 43, which allegedly occurred in the months of December 2011 and March 2012, respectively.  The jury was unable to reach a verdict on counts 29 through

---

[2]    For example, count 1 charged appellant with committing a lewd act, and count 2 charged her with committing unlawful sexual intercourse, on or between August 1, 2009, and August 31, 2009.  Likewise, count 3 charged her with committing a lewd act, and count 4 charged her with committing unlawful sexual intercourse, on or about September 1, 2009, through September 30, 2009.  Counts 5 through 26 followed suit.

3.

39, 41, and 42, which represented offenses allegedly occurring in the months of October through December 2010, January through August 2011, January and February 2012. The trial court declared a mistrial as to these counts and later dismissed them on the prosecution's motion.

Finally, the jury found appellant guilty on counts 44 and 45, the oral copulation and sodomy offenses allegedly occurring sometime between August 1, 2009, and March 1, 2012.

### III.    *Sentencing*

The trial court sentenced appellant to a total prison term of six years as follows: three years for count 2 (§ 261.5, subd. (d)), plus one year for count 18 (*ibid.*), eight months for count 28 (§ 261.5, subd. (c)), eight months for count 44 (§ 288a, subd. (b)(1)), and eight months for count 45 (§ 286, subd. (b)(1)). The terms appellant received for her other convictions were ordered to run concurrently or stayed under section 654.

### IV.    *Evidence Presented at Trial*

**The prosecution**

John, who was 18 years old at the time of trial, testified he first met appellant when he was around 13 years old, at a church camp in Santa Cruz. According to John's testimony, appellant came up and introduced herself and her husband, Phillip Schlensker (Phil), to John and a friend sitting with him. Appellant told them she was going to be the new youth pastor at the Lutheran church that John and his mother attended in Sonora, where they lived. Appellant asked John if he wanted to be invited to youth group events and he said yes.

When John returned to Sonora after the church camp, he began to attend youth group functions on a regular basis. At first, he mainly just hung out with the other kids and his perception of appellant did not change. His perception of her changed later, however, after they started "flirting" with each other. John recalled the first time appellant flirted with him was at her apartment, when he was not quite 14 years old.

4.

John's mother and Phil were in the kitchen and John was sitting on the couch. As appellant was walking to the kitchen, she winked at him. After this incident, John started "flirting back" with appellant and their flirting became more frequent.

John returned to the same church camp the following summer when he was 14 years old. He recalled an incident at the camp in which appellant hurt her knee at the beach and he gave her a piggyback ride. When they reached the stairs, appellant whispered in his ear, "I like having my legs wrapped around you."

After John's parents split up, his mother started working more hours and would bring him to appellant's apartment for appellant to watch him while his mother was at work. During this time, John's feelings towards appellant continued to change as their flirting became more intense. John would stay at appellant's apartment the whole time his mother was gone, which was from around 7:30 a.m. to 5:30 p.m. Phil was usually at work during this time.

John recalled his first kiss with appellant took place when they were sitting on the couch in her apartment, watching the movie "Resident Evil Distinction." It was during the summer, less than a week after they returned from church camp. John had his arm around appellant and leaned over and tried to kiss her. She told him "no," and he said "okay." About five minutes later, John tried to kiss appellant again and she kissed him back this time.

A few weeks after their first kiss, John and appellant started engaging in what John referred to in his testimony as "dry sex" with their clothes on. They engaged in "dry sex" more than 10 times.

The first time John and appellant had sexual intercourse was at John's house on Buena Oaks. John recalled that appellant and Phil started staying at their house when both John and appellant had the Swine Flu and, after that, appellant and Phil decided to move in with John and his mother.

5.

John testified that the first time he had sex with appellant, she came into his bedroom wearing "lingerie" consisting of a "white bra with lace" and "white pants with lace." After she lay down on the bed next to him, they began to have "dry sex" like they "normally" did. John then asked appellant whether "she fully wanted to go all the way this time." Appellant said she wanted to, but she did not want to betray her husband.

John testified that they "ended up … partially having sex." John explained he did not "penetrate her all the way." He denied that he forced himself on appellant. After they stopped, appellant left the room, sat on the stairs, and cried. John went to sit with her and started crying too because she was crying.

John could not recall specifically how long it was after their first time that he and appellant had sex again but recalled they "did it quite a bit." At first they had sex around three times a week but "eventually it was almost every day."

At some point, John, his mother, appellant, and Phil moved into a house on Arbona. They were only at the Arbona house for a month while they were looking for another house that they could all move into together.

John recalled one incident at the Arbona house when his mother returned home after forgetting something for work. His mother saw him lying in bed with appellant and got upset with him. John and appellant were not having sex when his mother saw them, and he responded to his mother by becoming angry and defensive. John's mother spoke with him later about the incident and told him it was inappropriate and she did not want to see it again.

During the month they were living in the Arbona house, John's feelings for appellant had developed to the point where he thought that he loved her and he told her so. At some point, appellant told John she loved him too. He could not remember when but thought it was during the same month.

After they moved out of the Arbona house, John, his mother, appellant, and Phil moved into a two-story house on Lakeside. At the Lakeside house, there was one

upstairs bedroom, which was where appellant and Phil stayed, and John's bedroom was at the bottom of the stairs.

John and appellant continued to have sex almost every night after moving to the Lakeside house. They would have sex in John's bedroom while Phil was upstairs. When asked how this was possible, John testified, "Well, she would lay in bed with me at night … and tell my mom and Phil that we were doing Bible study or we were reading or we were talking, and she would lie in bed with me, and that's when we would do that." The door to his bedroom was usually "cracked open, but sometimes it was closed."

John recalled two occasions at the Lakeside house where he and appellant almost got caught by his mother. On the first occasion, it was late at night and appellant was under the covers with him. They were about to have sex when his mother came in his room. His mother "wasn't happy" and directed him to come out and talk to her. John again reacted by getting upset with his mother because he did not want anyone to know or find out what was going on between him and appellant.

On the second occasion, John's mother came home early from work. John and appellant were upstairs in her room having sex when they heard his mother pull into the garage. Appellant went into the bathroom and John locked the door because he knew his mother was coming up and he needed time to put on his clothes. When John opened the door, his mother was upset about him being behind a closed door with appellant. John again responded by getting angry with his mother.

During the time they were living at the Lakeside house, appellant and John also had sex two or three times in his mother's car. This was when he was close to 17 years old and had just gotten his driver's license. During the same timeframe, they also had sex at the church two or three times. John recalled having sex in the youth group room in the afternoon and also in the "attic room" at night during a "lock in" which was when youth group kids would spend the night at the church.

7.

John further testified that he and appellant engaged in anal sex three times when they lived at the Lakeside house.  It had been his idea to have anal sex, but he did not force her.  They also engaged in oral sex more than 10 times during the course of their relationship, and they touched each other's private parts just about every time they engaged in sexual activity.

John recalled that appellant once gave him a note before she left on a trip for Hong Kong.  In the note, she wrote "You're always in my thoughts" and that she would see him again soon.  Appellant and Phil also gave John a card for his 16th birthday, and appellant gave him a separate birthday card that she signed as being from the dog and to be funny.

Sometime during the winter after John turned 16 years old, John and appellant bought rings as a token of their love for each other at an event called "Spirit West Coast" near Santa Cruz.  John had planned to buy appellant's ring for her, but, because he did not have any money, she bought both of their rings.  John thought the rings represented a promise that someday they would get married and be together, which was something they had previously talked about.

John acknowledged he and appellant would occasionally fight.  He explained that she would sometimes get upset with him when he had a girlfriend, and he would get upset because she was married, which was difficult for him to see every day.  John wanted appellant for himself and told her so.

John described an incident at the Lakeside house, in which he fired his nine-millimeter handgun in anger at appellant during a fight.  According to John, he bought the gun with money he earned from his job but it was registered in his mother's name.  For a long time, he kept the gun in his room in a safe and occasionally took the gun out when he went shooting with appellant.

John could not remember what he and appellant had been fighting about during the incident but recalled the fight had become "pretty heated" and appellant slapped him and ran upstairs.  John pulled out his gun and fired it up the stairs and the bullet went

8.

through the bedroom wall. Realizing what he had done, John dropped the gun and went into the bedroom to apologize and ask for appellant's forgiveness for losing his cool and firing a gun because he was angry.

John also testified regarding a time when his father came to the Lakeside house looking for him. He recalled being upstairs with appellant and Phil. They were still in their pajamas and just playing around like they often did. Appellant was giving John a "wet Willie" when Phil walked by the doorway and said, "Your dad's here." John walked downstairs and saw his father. His father was upset with him and asking things like, "What was going on up there? What's a wet Willie?"

In September 2011, after John turned 17 years old, his mother sent him to attend a school in Missouri, where he stayed until around Christmas. Days before John left for Missouri, he had sex with appellant in the church room. When John returned from Missouri, appellant and Phil had moved to Twain Harte and were no longer living at the Lakeside house where John's mother still lived.

At some point before John went to Missouri, his mother set up counseling appointments for him to talk to a pastor to find out what was going on between him and appellant. John lied and did not tell the pastor anything. On another occasion, to deflect his mother's suspicion from appellant, John told his mother, in front of appellant and Phil, that he had sex with appellant's sister, who was two years younger than appellant.[3]

In January 2012, about one or two weeks after his return from Missouri, John had sex with appellant at her house in Twain Harte. He could not remember how many times they had sex when she as living in Twain Harte but recalled that it would happen during his lunchbreak from school and that he would drive his mother's car up to Twain Hart to see appellant whenever he could.

---

[3] John claimed he actually did have sex with appellant's sister at the Lakeside house. However, appellant's sister denied having sex with John in her testimony for the defense.

9.

John stopped having sex with appellant after she and Phil moved to Oregon. John felt hurt when appellant moved, but they had talked about it and it was John's understanding that eventually he would get his own car to go visit appellant and Phil and eventually move there.

Sometime after appellant and Phil moved to Oregon, John received a text message from Phil essentially stating that appellant had told him what was going on and if John respected them to stay out of their lives and never talk to them again. Phil also said something to the effect he was disappointed but still cared about John. He was also upset that John had shot a gun in anger towards his wife.

Eventually, John told his mother about his relationship with appellant but made her promise not to press charges. After John told his mother, his mother told his father and, months later, someone told the police.

John's mother, Kathy S. (Kathy), was the first witness called by the prosecution. Her testimony provided background information about how she met appellant in 2008, after appellant came to work at the Lutheran church of which Kathy had been a member for a number of years. Kathy also testified about how, after separating from her husband, she came to ask appellant to help her look after John when she was working, and eventually to invite appellant and Phil to move in with her and John. The primary focus of Kathy's testimony, however, was on describing specific incidents that seemed suspicious to her and suggested the existence of an unusual or inappropriate relationship between appellant and John.

Kathy first testified to an incident that occurred in 2009, while she and John were living at the Buena Oaks house. The incident took place a few months into John's freshman year, when he was 15 years old, and at a time when Kathy was beginning to rely more and more on appellant to drive John to and from school. It was a school night, and John was in bed with the lights out. After Kathy saw his phone light up, she went into his room to investigate and found John texting with someone.

10.

After confiscating John's phone, Kathy saw a message on it which read, "Don't worry, it's only a little blood." When she asked him who wrote the message, he replied it was "just a friend." Kathy did not know the context of the message, but it appeared that someone was hurting or had gotten hurt. Kathy then noticed the phone number associated with the message had appellant's name on it. When she asked John about that, he maintained it was just a friend and did not explain how his friend had the same name as appellant.

One or two days later, Kathy confronted appellant with the text message and appellant denied recognizing the phone number. Kathy then punched the number into her own phone and showed appellant that it brought up her name. Appellant looked down, started crying, and revealed to Kathy some cut marks on her wrists.

When Kathy spoke with Phil about this incident, he expressed concern about appellant being alone in the evenings when he worked. After that, appellant and Phil started spending nights over at the Buena Oaks house.

During their past Bible studies together, appellant revealed to Kathy she had a "troubled past." Based on their conversations, Kathy believed she and appellant shared the same values and she trusted appellant and felt comfortable with her picking up John from school.

In addition to the texting incident, Kathy described two other unusual incidents she recalled occurring when appellant was staying with them at the Buena Oaks house. On one of the occasions, Kathy heard John get up out of bed and got up to check on him. As she was walking by appellant's room on the way to John's room, Kathy saw John in appellant's room, lying on top of her bed covers. He was wearing pajama shorts and an undershirt. Kathy told John to get up and go back to bed. John's reaction was "[a] little defensive, but compliant." Kathy recalled telling appellant that John did not belong in there and thought appellant said okay.

After the incident, Kathy followed up with appellant and Phil and told them that John did not belong in their room. Phil assured Kathy that John was like a brother to appellant and this was how appellant treated her own brothers. Kathy thought this was odd but concluded it was okay because John had been on top of the covers.

During the other incident she recalled occurring at the Buena Oaks house, Kathy heard muffled noises coming from appellant's room at night when Phil was at work. Kathy got up and walked to appellant's room. When she opened the door, she saw appellant and John in bed together under the covers. Kathy told John to get up and go to bed. John reacted by saying, "Mom, we were only talking." Kathy noticed John was wearing pajamas when he got out of the bed. Appellant did not get out of bed and Kathy could not recall whether appellant said anything.

A day or two later, Kathy spoke about the incident with John, appellant, and Phil. John repeated that he and appellant had only been talking and said she had been comforting him. Phil also reiterated that appellant viewed John as a brother and this was how she treated her brothers.

On February 1, 2010, Kathy and John moved from the Buena Oaks house into the Arbona house. It was both Kathy's and the Schlenskers's idea to move in together. Kathy explained that they "shared a common vision ultimately to have a place of refuge for the teenagers of the church" and the one-story house on Arbona was large enough for that purpose.

During the month they lived at the Arbona house, Kathy had the master bedroom while appellant and Phil had the guest bedroom across from John's bedroom. The arrangement was for John to be with appellant after school when Kathy was not around. Kathy worked three days a week on Monday, Tuesday, and Thursday, and would typically leave the house at 7:30 a.m. and return between 5:15 p.m. and 5:30 p.m.

Kathy recalled one unusual incident when they were living at the Arbona house. One morning, shortly after leaving the house for work, she realized she had forgotten

something and drove home. When she walked inside the house, she saw, in her peripheral vision, John jumping under the covers in appellant's bed.

Kathy walked into appellant's room and asked John what he was doing in her bed. John replied, "Oh, nothing mom." His demeanor was "nonchalant." When Kathy directed John to get out of the bed, she saw he was wearing his pajama bottoms and a shirt. Appellant did not say anything but "turned her head … as if she had been sleeping."

When Kathy spoke to appellant and Phil about this incident, they again reassured her that appellant had brotherly feelings towards John and this was how appellant behaved with her brothers. During the conversation, John's demeanor was defensive. He said nothing was happening and asked how she could think such a thing.

In March 2010, Kathy, John, appellant, and Phil moved from the Arbona house to the Lakeside house. During that time, appellant would engage in one-on-one Bible studies with youth group members upstairs in her room. Kathy estimated that John participated in private Bible study sessions with appellant in her room once a week but could not recall for how long this continued.

Starting from March 2010, the first suspicious incident Kathy could recall occurred late at night. When she went to John's room to check on him, she found appellant in bed with him under the covers.[4] Kathy turned on the lights and told appellant to get out of John's bed. When she got out of the bed, Kathy saw that appellant was wearing pajamas. Appellant told Kathy that John had been "frightened and needed to be comforted" and had asked her to read to him.

The next suspicious incident Kathy could recall occurred during the daytime. Looking for John, Kathy went upstairs and knocked on appellant's door. John unlocked

---

**4** Kathy testified that, as "a parent thing," she would frequently check on John in the middle of the night but did so less frequently as he got older.

and opened the door. Kathy did not see appellant right away. Appellant then walked out from the vanity area of the bathroom connected to the bedroom.

Another time, Kathy walked upstairs to appellant's room during the daytime and found appellant and John both lying on the floor. Appellant was wearing very short shorts and had one knee "propped up." John's head was within three or four inches of appellant's crotch area. Kathy "chit chatted with them for a moment" and then finally said, "This looks totally inappropriate. [John], you should not be that close to [appellant's] crotch area." Appellant took hold of a blanket that was on the floor, pulled it over her head, and turned away from Kathy. Meanwhile, John was saying, "There's nothing going on here" and "We're just sitting here having a conversation." John's demeanor seemed "a little put off that [Kathy] would even think that they would be inappropriate toward each other." Kathy remarked to appellant, "you're the adult" and "I don't understand why [John] is doing all the talking."

Kathy recalled after each of these three incidents occurring at the Lakeside house, she had follow-up meetings with appellant and Phil. Phil continued to respond the way he had done in the past, telling Kathy that appellant treated John as a brother and that he trusted his wife.

Regarding other occasions she found appellant and John in inappropriate positions or situations at the Lakeside house, Kathy testified that, sometimes when they were all watching television, appellant would have her hand on John's leg or they would have the covers over them while they were sitting next to each other. During these occasions, Phil was often sitting on the other side of appellant.

On another occasion, Kathy walked into the fireplace room at night before going to bed and found appellant with her arms around John's neck. Kathy testified it was "a close embrace, and [appellant] had one foot up and she's looking into his face." Kathy walked up to them and asked, "What's going on here?" John responded, "Nothing is going on. We were just talking."

14.

Another time, Kathy and John were planning to go somewhere and he wanted to say goodbye to appellant. When Kathy went upstairs to look for him, she saw appellant, apparently asleep, in bed under the covers. John was kneeling down next to the bed with one arm across appellant. His face was very close to her face as he was saying goodbye. When John appeared to kiss appellant, Kathy said, "What are you doing? It's time to go. We're leaving."

Kathy also testified regarding suspicious incidents or situations that occurred outside the home. In this regard, Kathy recalled that, in the summer of 2010, when they were on a camping trip, Kathy found Phil sitting alone at the campground and asked him where appellant and John were. Phil replied that they were in the tent. Kathy went to the tent and saw that the windows were closed and the door was zipped shut. When she opened up the door, she saw John lying on the air mattress with his shirt off and appellant giving him a massage. John complied when Kathy told him to get his shirt on and come out of the tent.

Another time during the summer of 2010, Kathy went with John, appellant, and at least four other girls from the church youth group to a Christian music event in Monterey called "Spirit West Coast." During the event, they camped together in a tent. Kathy recalled that appellant and John slept side by side, perpendicular to the other girls, who were at the other end of the tent. This had not been the intended sleeping arrangement and, while finding it unusual, Kathy did not insist that appellant and John move because they were both in their own separate sleeping bags.

Later the same summer or early in the fall of 2010, Kathy went with John, appellant, Phil, and three other youth group members to an event in San Jose called "Hands on Bay Area." During the event, they stayed in two hotel rooms. Kathy slept in the room with the youth group members, while appellant, Phil, and John slept in the other room. When Kathy asked John why he was sleeping with appellant and Phil, John replied he just wanted to.

15.

Kathy confirmed that there was a nine-millimeter handgun in the home between 2008 and 2012. Kathy testified that it belonged to her and she kept it in her room locked in a safe. She never gave it to John to use except when they went out target practicing.

Around the middle of September 2011, Kathy sent John to a "Christian-run school and teaching place for young men" called "Future Men" in Missouri. She was prompted to send him there by information she received from her stepdaughter, namely that John had confided in his stepsister and her husband that he and appellant were sexually involved.

Kathy called a pastor and arranged for him to be present when she confronted John with the information she had received from her stepdaughter. During the meeting with the pastor, John told Kathy that he had lied to his sister.

After meeting with the pastor, Kathy and John went to Wal-Mart. John told her he wanted to go inside to talk to Phil. Kathy responded that she did not want him to talk to Phil before she had a chance to confront Phil and appellant. John reacted by storming off into the Wal-Mart.

The next time Kathy saw John that night was at home around 10:15 p.m. Kathy had appellant and Phil come into her room and confronted them. During the confrontation, appellant said Kathy was just jealous and denied that she and John were having sex. Appellant also said that John had sex with her sister, who consequently was no longer allowed to be at the house. After the meeting, appellant and Phil went to their room and started packing up their things.

Dessi S. (Dessi), John's father and Kathy's ex-husband, testified regarding an incident involving John and appellant that struck him as unusual. Sometime around 2010, when John was 15 years old, Dessi went to the Lakeside house in the late morning or early afternoon, to look for John after he was unable to reach his son. No one responded when Dessi knocked on the front and back doors.

16.

Dessi heard voices coming from the upstairs and recognized those of appellant and John. Dessi entered the house through the garage and stood at the bottom of the stairs leading to the upstairs bedroom. He could hear John giggling and saying something like, "You know how that tickles me."

Dessi then saw Phil cross in front of the open bedroom door. Phil was wearing a robe which struck Dessi as strange given the time of day. Phil spotted Dessi and said, "Your father has broken in. [John], your father is standing at the bottom of the stairs."

John, who was wearing pajamas, came down the stairs and seemed upset with Dessi and the idea that his father had broken into the house. Not wanting to engage in a confrontation at that time, Dessi told John that he did not like what he was seeing, it was inappropriate, and that he was leaving. John followed Dessi as he walked out to the car. Shortly thereafter, Dessi communicated what he had seen to Kathy and his feelings that it was strange for John to be upstairs in the adults' private bedroom.

Besides John, Kathy, and Dessi, the only other witness called by the prosecution was Spencer Garrett. Garrett testified that he worked as a deputy with the Tuolumne County Sheriff's Office, when he interviewed John in Sonora on July 16, 2012, and interviewed appellant in Crescent City on August 1, 2012.

During the August 1, 2012, interview, appellant told Garrett that she viewed John like a brother and that she had been entrusted with his care. When Garrett told appellant that John was saying they had sex, she said no and that it was not something she would do. When asked how often she did Bible study with John, appellant responded that it was almost every night.

During her interview, appellant told Garrett that John had tried to have sex with her "very many times." When Garrett asked her if she thought about having sex with John, she said no and indicated she found the idea "disgusting" and "gross." She also responded in the negative when asked if she was capable of having sex with John.

17.

After Garrett asked appellant to "level" with him about what happened, appellant said, "He pinned me down." When asked why she never made a report, appellant responded that no one would believe her "because of all the stories you hear in the news of teachers and the gross things that they do with their students."

When Garrett told appellant that he did not believe all the sex they had was forced, she responded, "Not every time." When Garrett asked if she was just going along with sex, appellant replied "[y]eah" and said "she wished to God she had the strength not to."

When Garrett asked about the time period during which appellant and John had sex, appellant said it lasted a year and a half. Garrett also asked if she planned to end the relationship. Appellant told Garrett she kept telling John that it needed to end and, if what they believed was true, she would be going to hell and she would rather just stop and for John to be saved.

Towards the end of the interview, Garrett asked appellant what she thought should happen and she responded, "I feel like I should be punished." Appellant admitted she and John had a relationship and described it as "a sick twisted one."[5]

On cross-examination, Garrett acknowledged that appellant told him she had sex with John because she was afraid of him. She also reported that John shot at her two times and also hit her.

On redirect, Garrett testified that appellant told him John held her down the first several times they had sex. However, she did not say John forced her to have sex throughout the whole one-and-a-half year time period during which they were sexually involved.

---

[5] During cross-examination, defense counsel elicited contextual details regarding appellant's statement to Garrett describing her relationship with John as "sick" and "twisted." Garrett acknowledged that he asked appellant, "You feel that the first several times, he forced you to have sex with him?" to which she responded, "That's more than a feeling." Garrett continued, "But then it sounds like you guys develop somewhat of a relationship" to which appellant replied, "A sick, twisted one." Garrett acknowledged that he next asked appellant whether she "had good times and bad times," and that she replied "it was all bad."

**The defense**

Appellant testified that she and Phil moved to Sonora in June 2007, and that she started working at the Lutheran church in July 2007, which was also when she first met John. She later met Kathy in the fall of 2007. Between July 2007 and August 2009, appellant and Phil lived in an apartment on Flora Lane.

According to appellant's testimony, she and Kathy grew closer in the latter part of 2008, through their joint participation in Bible study and their relationship continued to evolve in 2009. Appellant also got to know John better in the confirmation class he was required to take before his confirmation in 2009.

At Kathy's request, appellant began babysitting John in June 2009. Appellant would watch him on Mondays, Tuesdays, and Thursdays, while Kathy had him on Wednesdays and Fridays. Appellant did not flirt with John at all.

Appellant's work required her to attend a Christian summer camp, which John attended during the last week of July 2009. On one occasion at the camp, appellant busted her knee during surfing lessons and was unable to climb up the hill. Because John was the biggest person there, he volunteered to carry her up the hill. When he carried her up the hill piggyback style, appellant did not flirt with him or make any remarks of a physical or sexual nature.

In August 2009, appellant and Phil started spending more time at the Buena Oaks house where Kathy and John lived. Appellant recalled an incident when John forcibly tried to kiss her when they were sitting on the couch watching television. He pushed her head up against the couch with his face on hers while she tried to push him off.

On another occasion, John came in the room where appellant was folding laundry and pushed her against the dresser and "proceeded to hump [her] body until … he came." John did not have appellant's consent to do this and she did not say or do anything to encourage it. Appellant estimated that John assaulted her in this manner three times at the Flora Lane apartment and once at the Buena Oaks house.

19.

During the incident at the Buena Oaks house, appellant told John she was going to tell his mother that he was doing something inappropriate. John responded by threatening that if appellant told his mother, he would kill his mother, paint his mother's room with her blood, and tell "the cops" that appellant did it against him. Appellant believed John's threats because he had begun bullying her that summer and she had seen him laugh when people died and got shot in movies he was watching. Appellant had also heard from Kathy that John had tried to beat her up and was getting out of control, which was why Kathy said she needed appellant's and Phil's help with John.

Not long after the Buena Oaks incident, John raped appellant for the first time. Appellant went on to testify in detail about this and other specific incidents of nonconsensual sexual intercourse appellant claimed John subjected her to between August 2009 and February 2012.[6] In this regard, appellant testified that they had nonconsensual sex two times in August 2009, one time in September 2009, two or three times in October 2009, one time in December 2009, three or four times in February 2010, one time in August 2010, one or two times in September 2010, three times in October 2010, a few times (she could not recall how many) in November 2010, three times in January 2011, two times in April 2011, one time in May 2011, one time in July 2011, three times in January 2012, and two times in February 2012.[7] Appellant also claimed John forced her to orally copulate him one time in March 2011, and one time in June 2012.

---

[6]    In contrast to John's testimony that they had consensual sex almost every day, appellant's testimony indicated the specific incidents of nonconsensual sex she described represented the only sexual encounters between them during the relevant timeframe that she could recall.

[7]    In her testimony, appellant indicated there might have been incidents of nonconsensual sex between her and John in April 2010 and May 2010, but she could not specifically recall any and explained she had been ill during this period and ultimately had to have surgery to remove her gallbladder in May.

In her testimony, appellant described various circumstances, such as visits from relatives, out-of-town trips, and illnesses she suffered, which occupied her during the months she claimed no sexual encounters with John occurred. Appellant also called various relatives as defense witnesses to corroborate the visits and trips she described in her testimony.

Appellant further testified regarding circumstances that caused her to be fearful of John. According to her testimony, during their sexual encounters, John would threaten to kill people, including himself, Phil, and Kathy, if appellant would not have sex with him. Appellant personally witnessed John hit Kathy twice while they were arguing. During the first incident, which occurred at the Buena Oaks house, around September 2009, appellant saw John punch Kathy in the arm. During the second incident, which occurred at the Lakeside house sometime in the summer of 2010, appellant saw Kathy fall down crying after John hit her in the back with a walking stick. John also hit appellant at least once a month when he was in a rage. On another occasion, appellant learned that John had hit Kathy after appellant woke up one night and observed two police officers had come to the house and were speaking separately to John and Kathy. Afterwards, John and Kathy both talked to her about what happened.

Appellant also described two incidents where John fired his nine-millimeter handgun at her. During one of the incidents, which occurred in the fall of 2010, John called appellant names and she slapped him. Not knowing John had a gun, appellant ran up the stairs. As she reached the top of the stairs and opened the bedroom door, she heard a shot and felt the bullet go by her hip. She then ran into the bedroom and locked the door behind her.

The second incident occurred around October or November 2010. John was target-shooting in the backyard. Although appellant was trying to fix holes in the fence to prevent the dog from getting out, John would not stop shooting. Finally, John shot the

21.

tree that was right next to appellant's head. Appellant explained that she heard the bullet whiz by her head and then saw it in the tree, after which she ran crying into the house.

Appellant further testified that she attempted to commit suicide once in 2010 and once in 2011. The first attempt was at the end of September 2010. Appellant explained she became manic and told Phil she could not live anymore. He took her to a medical clinic where she was assessed and held for three days. The second attempt occurred in September 2011, and Phil took her to the hospital. Appellant did not know how long she was in the hospital because the overdose she took caused her to blackout for part of the time.

In her testimony, appellant also described her impoverished upbringing and long history of being subject to sexual abuse beginning at a young age. The sexual abuse was perpetrated by various different individuals in her lives, including, among others, an older cousin and her verbally abusive grandmother. When appellant was a teenager, her mother started letting young men, who had been kicked out or run away from troubled homes, stay indefinitely in the trailer where appellant's family lived. When appellant was between the ages of 18 and 19, one of these men began to rape her on a nightly basis. As a result, appellant became pregnant and gave up the child for adoption.

Sabrina C., who was a member of appellant's church youth group when she was 15 years old, testified that between 2010 and 2011, she noticed a change in appellant's relationship with John in that appellant began to seem much more nervous around John. Sabrina estimated that she saw appellant try to avoid being around John a "[c]ouple dozen" times.

Therapist Linda Barnard testified as an expert on posttraumatic stress disorder (PTSD) and rape trauma syndrome (RTS). Barnard assessed appellant and concluded that appellant suffered from PTSD and RTS. Barnard opined that appellant had been suffering from these conditions from the time she was a teenager.

22.

In generally describing PTSD and RTS, Barnard testified that women raped by an acquaintance rarely report the rape and that it is not unusual for a victim of acquaintance rape to have an ongoing relationship with the perpetrator. A person who suffers from PTSD and RTS is vulnerable to being sexually assaulted as an adult. A person who has experienced trauma in the past can also easily get trapped into accommodating a new trauma, a phenomenon known as "accommodation trap."

**The rebuttal**

Kathy disputed some of the incidents or aspects of incidents described by appellant in her testimony. For example, Kathy denied that John ever hit her with a walking stick and testified she would have called the police if he did. Kathy acknowledged that there was a time that two police officers came to the Arbona house in uniform. However, she was sure appellant and Phil were not there at the time because she would never humiliate John by calling the police when other people were at the house. Kathy also claimed she called the police, not because she feared for her safety but because she was upset and distraught and feared for the safety of John, who had contracted the Swine Flu.

John denied ever telling appellant he would kill his mother and paint her room with her blood. He admitted making threats on Phil's life early in his relationship with appellant but explained the threats would come up during his arguments with appellant when he was angry about her being married. He never forced appellant to have sex with him, nor did he ever make threats to hurt himself or anyone else in order to force her to have sex with him.[8]

---

[8] On cross-examination, appellant admitted he threatened to hurt himself to appellant. He also threatened to kill his mother once while when they were living at the Lakeside house before he went to Missouri.

## *DISCUSSION*

On appeal, appellant contends that the trial court prejudicially erred by restricting Barnard's testimony regarding her opinion that appellant suffered from PTSD and RTS at the time of the charged offenses. We agree the court's restriction on Barnard's testimony requires reversal of the judgment.

We review the trial court's decision to admit or exclude evidence—including expert opinion testimony—for abuse of discretion. (See *People v. Cortes* (2011) 192 Cal.App.4th 873, 908 (*Cortes*).)

The relevant statutes concerning expert testimony about a defendant's mental state are sections 25, 28, and 29. In section 25, the Legislature abolished the defense of diminished capacity. In section 28, subdivision (a), the Legislature specified that "[e]vidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." In section 29, the Legislature restricted expert testimony as follows: "[A]ny expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged."

In *Cortes*, *supra*, 192 Cal.App.4th 873, the Court of Appeal reviewed the scope of expert testimony concerning a criminal defendant's mental state. The court explained that a defendant "cannot put on an expert to testify that, because of his mental disorder or condition …, he or she did not have the ability, or capacity, to form or harbor whatever mental state is a required element of the charged offense, such as intent to kill, or malice aforethought, or premeditation, or deliberation." (*Id.* at p. 908.) However, an expert can testify that the defendant had a mental disorder or condition "as long as that testimony tends to show that the defendant did not in actuality" have the required mental state, and

24.

as long as the expert does not "offer the opinion that the defendant actually did, or did not, harbor the specific intent at issue." (*Ibid.*)

The defendant in *Cortes* was convicted of first degree murder after he stabbed the victim 13 times during a fight. The trial court barred the defendant from presenting expert opinion testimony that the defendant had likely "entered a dissociated state" prior to the stabbing. (*Cortes*, *supra*, 192 Cal.App.4th at p. 893.) The Court of Appeal held that the expert should have been able to give that opinion. (*Id.* at p. 911.) The court noted that the expert also could have testified that dissociation "*can* cause the person to act without conscious volition." (*Ibid.*) Such testimony would only "have given the jury a basis *to infer*" that the defendant did not actually have the mental state required for first degree murder, and thus it would have fallen short of expressing an opinion that the defendant actually lacked the required mental state. (*Id.* at p. 912.)

Similar issues were addressed in *People v. Nunn* (1996) 50 Cal.App.4th 1357, where the defendant was convicted of attempted murder after shooting at a group of men. There, the defendant was precluded from presenting a clinical psychologist's opinion that due to inebriation and past traumatic experiences, the defendant had "fired his rifle impulsively." (*Id*. at p. 1362.) On appeal, the *Nunn* court upheld the trial court's ruling, explaining that "[a]n expert may not evade the restrictions of section 29 by couching an opinion in words which are or would be taken as synonyms for the mental states involved." (*Id.* at p. 1364.)

The court in *People v. Borderlon* (2008) 162 Cal.App.4th 1311 (*Borderlon*) followed *Nunn* in holding that an expert could not be asked hypothetical questions that would be the "functional equivalent" of asking whether the defendant had a particular intent. (*Borderlon,* at p. 1327.) In *Borderlon*, the defendant was charged with committing a robbery shortly after being released from prison. He presented "expert testimony on 'institutionalization,' a dependence on life in an institutional setting that made living outside the institution akin to adjusting to a new culture" (*id.* at p. 1315), and

25.

he proposed to ask the expert whether an individual in the defendant's circumstances would have the intent to commit robbery. The court held that the defendant was properly precluded from asking such a hypothetical question, noting that the defendant "was simply planning by means of the hypothetical to do indirectly what he could not do directly under the statute, namely elicit an opinion from [the expert] regarding defendant's specific intent .…" (*Id.* at p. 1327.)

Under the above authorities, Barnard could properly testify that appellant suffered PTSD and RTS at the time of the offenses. Such testimony was not tantamount to an opinion that appellant actually lacked the requisite mental state for any of the charged offenses. The court therefore abused its discretion in concluding otherwise and consequently restricting Barnard's testimony to preclude her from testifying that appellant suffered from PTSD and RTS at the time of the offenses.

The trial court's restriction of Barnard's testimony prejudiced appellant's case. Appellant's primary defense theory was that any sexual activity that occurred between her and John was nonconsensual and her participation was either physically coerced by him or she submitted to him out of fear based on his violent acts and threats aimed both at herself and others. The restriction prevented appellant from fully developing this defense by depriving the jury of a means to connect her PTSD and RTS diagnoses with her mental state and conduct at the time of the offenses.

In his opening statement, defense counsel indicated that Barnard's testimony would be significant because the conditions of PTSD and RTS can explain why a victim might fail to report a rape or fail to "react to it like you would expect a person would in like or normal circumstances because of the background and because of the diagnosis." The court's restriction on Barnard's testimony prevented defense counsel from inquiring, either specifically or hypothetically, into whether certain behaviors appellant exhibited at the time of the offenses could be viewed as consistent with her PTSD or RTS diagnoses,

26.

which was a valid area of inquiry, as defense counsel pointed out in opposing the restriction.**9**

Respondent urges that, because defense counsel managed to elicit testimony from Barnard that appellant had suffered PTSD and RTS since she was a teenager, which implicitly included the timeframe of the charged offenses, the court's restriction on Barnard's testimony did not prejudice appellant's defense. However, as illustrated by the forgoing discussion, the court's restriction did not simply preclude defense counsel from asking Barnard whether appellant suffered PTSD and RTS at the time of the offenses, it precluded relevant and valid inquiry into how these conditions could have affected appellant's behavior and perceptions at that time and whether her behavior was consistent with these conditions. This restriction on Barnard's testimony was significant because it limited appellant's ability to counter the prosecution's theory that appellant's behavior during the time of the offenses, particularly as reported by John's mother, was inconsistent with appellant's claims that she feared John and was acting under duress when she engaged in sexual activity with him.

During Kathy's testimony describing occasions where she found appellant and John together in unusual or suspicious circumstances, the prosecutor frequently elicited testimony to the effect that appellant never appeared to be afraid or upset on those occasions. The court's restriction on Barnard's testimony prevented defense counsel from specifically asking the expert whether appellant's reported lack of fear or negative emotions around John could be consistent with her PTSD and RTS diagnoses, and thereby limited the defense's ability to provide the jury with a basis for inferring an alternative explanation for appellant's behavior than the one offered by the prosecution. (See e.g., *Cortes*, *supra*, 192 Cal.App.24th at p. 913.)

---

**9** The trial court, however, properly refused to allow defense counsel to ask the expert directly whether, due to her mental conditions, appellant was able to form "the specific intent to sexually arouse" required for the lewd act offenses.

27.

The case essentially boiled down to a credibility contest between appellant and John. As mentioned above, the overwhelming majority of the offenses on which appellant was convicted allegedly occurred between August 1, 2009, and August 21, 2010. This timeframe coincides closely with the timeframe covered by Kathy's testimony regarding specific incidents she observed finding appellant and John in unusual or suspicious situations. The last few incidents she recalled in her testimony were specifically described as occurring in the late summer and early fall of 2010. Thus, Kathy's testimony tended to corroborate John's account of the existence of an affectionate relationship between himself and appellant during this time period. However, Kathy's testimony did not provide similar corroboration for the offenses allegedly occurring between August 22, 2010, and March 31, 2012, and the jury was unable to reach a verdict on most of these offenses and found appellant not guilty of three of them.[10]

The verdicts suggest a strong possibility that Kathy's testimony affected the jury's assessment of the credibility of the respective accounts provided by John and appellant of their sexual encounters during the earlier timeframe. The trial court's restriction of Barnard's testimony prejudiced the defense's ability to counter the unfavorable inferences raised by Kathy's testimony and to provide an alternative explanation for reported behavior that, on its surface, appeared inconsistent with appellant's claim that she feared John. Under the unique circumstances of this case, we conclude it is reasonably probable that the undue restriction on Barnard's testimony precluded the jury from properly considering appellant's PTSD and RTS diagnoses in relation to the mental state necessary to convict her of committing lewd acts against John, as well as the mental

---

[10] The only offenses on which appellant was convicted that were not specifically tied to one of the two timeframes discussed above were the sodomy and oral copulation charged in counts 44 and 45, which allegedly occurred sometime between August 1, 2009, and March 1, 2012.

state required for her defense of duress to all the charged offenses. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *Cortes*, *supra*, 192 Cal.App.4th at pp. 912–913.)

## ***DISPOSITION***

The judgment is reversed.

_____
                                                         HILL, P.J.

WE CONCUR:


_____
GOMES, J.


_____
SMITH, J.